## Nunnelly *v.* Warner Iron Co.

### (*Nashville.* January 19, 1895.)

1. CONTRACTS. *Rules of construction.*

   The rules and principles laid down for the exposition of contracts have for their sole object to do justice between the parties by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made. The intention is the governing principle of construction. In ascertaining the intention, the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it may all be looked to by the Court. (*Post, pp. 291, 292.*)

   Case cited and approved: McNairy *v.* Thompson, 1 Sneed, 149.

2. CASE IN JUDGMENT. *Mining lease construed.*

   Under a mining lease providing that the lessee shall pay, as royalty, one tenth of the output of the mines, delivered in shipping order, accessible to wagons, at the mine or shaft, or the cost price of mining and delivering same as stated, the lessor must accept riddled ore, according to the usage at date of lease, or the cost of mining and delivering "riddled ore" at the mine or shaft, and cannot exact ores, or the cost of mining and delivering ores, of a higher grade prepared by the use of modern and improved processes and machinery adopted at the lessee's expense after the date of the lease. (*Post, pp. 283–294.*)

---

#### FROM HICKMAN.

---

Appeal from Chancery Court of Hickman County. A. J. ABERNATHY, Ch.

PITTS & MEEKS for Nunnelly.

STEGER, WASHINGTON & JACKSON, W. P. CLARK, and J. C. BRADFORD for Warner Iron Co.

M. B. HOWELL, Sp. J. The bill in this case was filed on September 7, 1891, by the devisees and legatees of L. H. Nunnelly, deceased, for the purpose of having construed by the Court a contract, made on December 11, 1880, between L. H. Nunnelly and L. S. Goodrich, whereby a tract of about fifty acres of land in Hickman County was leased by Nunnelly to Goodrich for the term of sixteen years. The clauses in the contract necessary to be noticed are as follows :

"It is hereby agreed between said parties that the party of the second part shall have the exclusive right to mine, dig, or in any other way mine, all the iron ore or other minerals, and the exclusive right to the use and benefit of all said ores, minerals, or products that may be upon or under said land, for the term of years specified.

"In consideration thereof, the party of the second part bind themselves to give to the party of the first part one tenth part of all the iron ore, or other products, or minerals, obtained from said land, delivered at the mine or shaft in shipping order and accessible to wagons, or pay for the same the cost price of mining and delivering as above stated. If royalty is required to be paid in iron ore or other minerals, delivery shall be in one hundred ton

lots, and to be moved from mines by the first party within thirty days after notification of delivery. If royalty is paid in money, settlements to be made quarterly from certified statements."

Before any mining was done, Goodrich assigned the lease to the Warner Iron Company. This company opened mines and operated for several years, and then assigned its rights under the lease to the Southern Iron Company. This latter company was in possession and operating at the date of the filing of the bill.

At the time the lease was made, the Warner Iron Company was erecting a blast furnace at a point twelve or fourteen miles from the leased land, on the line of a railroad then under construction, which was soon after extended near the land and beyond it about twenty miles. At that point was located Ætna furnace, afterwards bought by the Southern Iron Company. Meantime, a third furnace, called the Goodrich or Bird's Creek, had been constructed by the S. C. Company near the leased tract, which was also bought and operated by said company.

The Warner Iron Company also bought a tract of about one thousand acres of mineral land adjoining the leased premises, and they mined the ore from said tract, and from the leased land, which was used in operating their furnaces.

The first mining was done in part by contract, complainant, W. S. Nunnelly, being one of the con-

tractors. The compensation paid for mining was about $1.55 per ton for the first 1,000 tons; $1.40 per ton for the next 2,000 tons; and $1.30 per ton for the residue mined, and 20 cents per ton additional for hauling to the railroad station. On the ore so mined the company paid royalty of $15\frac{1}{2}$, 14, and 13 cents, respectively, the mining being more expensive at first because of the amount of "dead work" required.

This exclusive contract mining continued only a short time, and thereafter mining was mainly carried on by the company itself, though a portion of the ore was still procured by contract. After taking the mining operations into their own hands, the Warner Iron Company, through its agent, Goodrich, stated and claimed that the cost of mining and delivery did not exceed one dollar per ton, on which the royalty would be one tenth, or ten cents, per ton, and this royalty was accepted with the understanding that if the actual cost was more than one dollar per ton, the royalty should be proportionately increased.

The mining was for some time carried on by digging out the ore from horizontal cuts into the side of the hill or ridge, loading on wagons with shovels, and hauling the ore away from the opening of the mine or shaft. The mass was then thrown upon riddles, or sifted to free it from dirt, the larger pieces broken up with sledges, the stones picked out by hand, and the ore thus obtained, more

or less contaminated with earth and stones, was weighed, and this weight accepted as showing the quantity of ore delivered.

Afterwards, the Warner Iron Company built a tramway from the railroad into the mines, and removed the ore by tram cars; and they constructed machinery whereby the ore was freed from stones and washed and the "shot ore" preserved, the iron material comparatively free from impurities being thus obtained. The first washing plant was comparatively crude; the second was elaborate, and seems to have been expensive. After the second washing plant had been constructed, the complainants demanded that they be paid their royalty in one tenth of the ore thus cleaned and washed.

This demand was refused, on the ground that they were not entitled to the washed ore, and that this was not contemplated in the contract; but it was admitted that they were entitled to screened or riddled ore.

The complainants then demanded that the company make a full statement of its expenditures in erecting its mining plant and machinery; in preparing to conduct, and in conducting, the water to the washer, including the cost of dams, pipes, etc.; the amount of "dead work" done; the cost of excavating and grading for tramway tracks; and any and all other expense incurred in building and maintaining the washing and cleaning plant, in order that they might learn in this manner the actual cost of mining and deliv-

ering the ore ready for the furnace. Various interviews were had between complainants and their attorneys, on the one part, and the company's agents on the other, but no conclusion was reached, and no statement of the kind demanded was furnished, the company's officers stating that the cost of mining did not exceed one dollar per ton, and paying royalty on that basis.

The complainants insist that the only proper mode of determining the cost of mining, and thus ascertaining the royalty due to them in money, is to take the entire product of the mine since it has been operated; then to estimate, as part of the cost of the work, the interest on the original investment by the company in the purchase of machinery of all kinds used in connection with said plant; the expense of putting same down and in condition for operation; the wear and tear of the same; the actual cost of any machinery or works that have become worn out or worthless, including dams, water-pipes, pumps, engines, cars, tools, and appliances, together with the expenses of operation and labor, and amounts paid for fuel and repairs—in short, aggregating every element of cost or expense incurred in the erection and operation of said mining plant and machinery, and dividing such aggregate by the number of tons of ore produced. They admit that in this estimate nothing is included on account of permanent investment in the plant, wear and tear of machinery, or the cost of dead work, and they claim that these are necessary

elements in the cost, as the work could not have been done without them, and, but for the purposes of the work, they are worthless. The complainants pray for an accounting on this basis.

The defendants admit the material facts charged in the bill with regard to the contract and the mode of mining the ore, and add that, prior to the death of L. H. Nunnelly, and up to about October 15, 1884 (Mr. Nunnelly having died in 1885), the ore was obtained by picks and shovels, and was riddled and screened; and that the royalty, in full, to the date named, was paid. No more mining was then done until November, 1887, but under that provision in the lease contract to the effect that the lease might be kept alive by paying royalty, the company paid to complainant, W. S. Nunnelly, $2,000—$1,000 on February 18, 1886, and $1,000 on January 25, 1887.

On March 29, 1888, W. S. Nunnelly wrote a letter to J. C. Warner, saying that he and Mr. Meeks considered the Goodrich lease forfeited, but, because the company had paid more money than it got ore, they were willing that the company should continue to mine on the leased land until the ore mined should amount to the money advanced. He further said, that they insisted that the company keep the shovel at work on the land till the requisite amount of ore was obtained, and on this amount of ore they would accept ten cents per ton for royalty, if Mr. Warner would say that was one tenth the

value of the ore per ton.    He added that they were willing to make a new contract, but not to reinstate the former one.

It does not appear that any other contract was made, nor that the contract was treated as abrogated. On the contrary, all subsequent dealings were upon the basis of the Goodrich lease.

The defendants further say, that, after operating the leased mines for a time, it was found that the furnace could not be profitably run, amongst other things, on account of the cost and small output of ore; that the Warner Iron Company bought a tract of mineral land adjoining the leased premises, and provided itself with machinery, such as steam shovel and crusher; that this machinery was put up on its own land, and, during the time when mining ceased on the leased land, it was continued on their own property; that the defendant company also put up an elaborate and costly plant, whereby the ores, after they had been mined, could be properly prepared for smelting.    Before the erection of this machinery, when the ore had been delivered by the contract miner, and the quantity determined for purposes of his charges and royalty, the mass had been burned or calcined in order to remove earth and stones. The new method was in the place of calcining, and further enabled the company to save the very small particles, called "shot ore," which had gone through the riddles and screens and been lost; that, under the pick and shovel and screening method of mining, the

19—10 P

only elements of cost were those created by digging, screening, and placing the ore so as to be accessible to wagons at the mine or shaft, and that the machinery for washing had no more to do with the mining, or its cost, than had the old method of calcining. The defendants further claim that the lessors have been paid the full cost of mining, and have received royalty for every ton of ore taken from their land.

The Chancellor decreed that the complainants were entitled, under the terms of the lease contract, to one tenth of the ore mined upon the leased land by the defendants, in shipping order, accessible to wagons, or to one tenth of the cost thereof; that ore was in shipping order when mined and riddled or screened, and at a point where it could be reached and hauled away by wagons; that the cost of such ore did not exceed one dollar per ton, and that complainants were not entitled to have considered the cost of the machinery used by the defendants, but only the cost of the riddled ore; and the complainants having mined and taken some ore from the leased land, and the amounts mined by defendants not having been determined, nor how much had been paid to complainants by defendants for ore mined on the leased land, a reference was ordered for an account to be taken by the Clerk and Master to ascertain how much ore had been mined by the defendants, and what amounts of money had been paid by them; how much ore the complainants had taken from the land since the date of the

lease; and, treating the cost of mining at one dollar per ton, the amount due from one party to the other.

From this decree complainants have appealed, and assigned error.

The first assignment is that the Court erred in restricting complainants to the cost of "riddled ore," or that mined by hand and screened in the manner prevailing at the beginning of the lease, and not allowing, as the basis of actual cost, the expense incurred in mining and delivering the ore in shipping order by the processes actually adopted by the defendants for putting the ore in that condition. In other words, complainants assign as error that the Chancellor did not allow the cost of the ore, washed, cleaned, and ready for delivery to the blast furnace, after having passed through the treatment by the machinery used for that purpose, as the basis of ascertaining the royalty due to the complainants.

The second error assigned was that the Court decreed that the cost of mining by hand did not exceed one dollar per ton.

"The rules and principles laid down for the exposition of contracts have for their sole object 'to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.' The intention is the governing principle of construction. In ascertaining the intention,

the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it may all be looked to by the Court." *McNairy* v. *Thompson*, 1 Sneed, 149.

The contract made between L. H. Nunnelly and others and L. S. Goodrich, on December 11, 1880, gave to Goodrich the exclusive right to mine, dig, or in any other way mine, all the iron ore or other minerals, and the exclusive right to the use and benefit of all said ores, minerals, or products that might be upon or under said land for sixteen years. As payment for such ores or minerals, Goodrich obligated himself to give to the lessors one tenth part of all the iron ore or other products or minerals obtained from said land, delivered at the mine or shaft in shipping order and accessible to wagons, or to pay the cost price of mining and delivery as above stated. It was further provided that, if the royalty should be required to be paid in iron ore or other minerals, delivery should be made in 100-ton lots, to be moved from the mines by the lessors within thirty days after notification of delivery.

It is evident that the parties, in making these stipulations, contemplated the delivery of, or the payment of royalty upon, ore at the mouth or opening of the mine in shipping order. It is further evident that, by the words "in shipping order," was meant that the ore should be reasonably free from earth, stones, or gravel, and such other impurities as could be readily found and removed. That this

construction was put upon the meaning of the contract up to the time of the erection of the washers, is shown by the fact that ore so ·prepared was hauled to the railroad station, the hauling paid for separately, the ore weighed, and the royalty per ton fixed by the weight. The further preparation of the ore for the furnace was solely the business of the company.

The fact that the defendants, assignees of Goodrich, the first lessee, adopted modern and improved methods of lifting and removing the ores cannot enlarge or affect the rights of the lessors. Whatever might be the increased facility or expedition with which the ores were mined by machinery over the hand digging modes, the right continued in the lessors to have one tenth of the ore at the mine or shaft in shipping order, or one tenth of the cost of placing it in that condition at that point. If the lessees were able to mine a larger quantity at a diminished cost, the lessors would receive a larger sum in royalty during a given time.

The processes used by the lessees for more effectually cleansing the ores and making them ready to go into the furnace, had no connection with the mining and delivering at the mine in shipping order, and, therefore, the expense thus incurred ought not to enter into the cost of mining. We are, therefore, of opinion that the first assignment of error should be overruled, and the decree of the Chancellor, in this respect, affirmed.

The testimony in the record does not clearly show what was the exact cost of mining ore from the leased land, after the resumption of operations in November, 1887. It is stated, by Mr. McNeilly, who was the secretary of the Southern Iron Company, that settlements were had, in full, with Mr. L. H. Nunnelly, the original lessor, for all ore mined prior to about October 15, 1884, when the work ceased. The weight of the evidence is in favor of the conclusion that, after the mines had been first opened, the cost of mining ore was not, at any time, in excess of one dollar per ton. We are, therefore, of opinion that the second assignment of error is not well taken, and that the decree of the Chancellor, in this respect, also, should be affirmed.

The cause will be remanded to the Chancery Court of Hickman County for the taking of the account ordered by the Chancellor. The complainants will pay the costs of the appeal. The costs of the Court below will be paid as the Chancellor may direct.