## FRIERSON v. INTERNATIONAL AGRICULTURAL CORPORATION.—148 S. W. (2d) 27.

Middle Section. July 27, 1940.

Petition for Certiorari denied by Supreme Court. February 15, 1941.

618

M. A. Peebles, of Nashville, for Zara Lydia Frierson.

McConnico, Armistead, Waller & Davis, of Nashville, for International Agricultural Corporation.

JOE C. HIGGINS, S. J. From a decree dismissing her bill complainant prayed and perfected her appeal to this Court and is here assigning numerous errors. A brief statement of the contents of her bill followed by a summation of the evidence will suffice for our disposition of these many specifications of error.

Complainant alleged that she was the owner in fee of many tracts of land lying contiguously in Maury County, embracing one large tract of about 715 acres, generally known as the Martha G. Frierson trust estate, which property had passed to complainant by devise from her husband upon whom the property had devolved at the termination or falling in of that trust, excepting some small added parcels not very clearly designated or described.

Much of complainant's bill is devoted to a detailed statement of her title. A recital or incorporation herein of these allegations will serve no useful purpose in solving the questions arising.

Complainant alleged that Mrs. Martha G. Frierson, an ancestor of complainant's husband, had on the 15th day of September, 1896, joined with George W. Killebrew and John S. Frierson, Jr., as trustees under the will of Martha G. Frierson's father, James Granberry, and with Mrs. Donna F. Killebrew, wife of the aforesaid George W. Killebrew, and John S. Frierson as beneficiaries, had executed a contract with the Blue Grass Phosphate Company, in which the parties hereinabove named were declared to be parties of the first part, undertook to sell or lease the major portion of the property herein involved to this Blue Grass Phosphate Company under certain specified terms and conditions. Under this contract the parties of the first part being predecessors in title to complainant, agreed to sell to the Blue Grass Phosphate Company all the phosphate rock on or under the lands in controversy with certain exclusions therefrom, and with certain restrictions as to the area to be mined by the lessee, together with certain rights of way to be en-

joyed by the aforesaid lessee or vendee. The consideration was stated to be 380 shares of the capital stock of the leasing corporation.

Two things about this conveyance should be borne in mind, namely, that George W. Killebrew, who became quite active in the formation of a later agreement, was trustee and one of the lessors, and that his wife was in some way interested in the property, and that the parties of the first part, that is, Killebrew and others, were the purchasers of 380 shares of the capital stock of the Blue Grass Phosphate Company.

It is further provided that the lessee was to pay 15 cents per ton for all phosphate of a certain grade mined from the premises, payments to be made within 60 days with a proviso that if such payments remained unpaid for a period of 60 days, the contract could be terminated at the option of the lessors.

It is further provided that the lessee was to begin operations and mining with reasonable diligence and bound to mine and ship not less than 3,000 tons per annum provided there was sufficient phosphate of a certain grade to be found, and that in case of failure to mine that quantity the lessee agreed to pay 15 per ton for at least 3,000 tons whether mined or not.

It was further alleged by complainant that on the 20th day of August, 1909, the aforesaid Blue Grass Phosphate Company, the lessee under the contract of September 15, 1896, entered into an agreement in writing with the defendant to this suit, wherein the Blue Grass Company designated in this later agreement as the party of the first part, had sold and transferred to this defendant all the property described in a certain schedule annexed to the instrument, and the parties of the first part undertook to assign to this defendant all the rights and interests which he had acquired under certain leases with Alexander Brothers and Mr. Killebrew, and likewise conveying all the phosphate and phosphate bearing rock in certain specified lands lying in Maury County and which were embraced in the lease of September 15, 1896, and the party of the first part endeavored to vest this defendant with all the rights and easements appertaining to the property including all personal property upon the premises enumerated as mining plant, machinery, tools, implements and all the mined rock that was then upon the premises. The consideration and reciprocal obligation of the party of the second part, that is the defendant herein, were the delivery of $250,000 of the capital stock of this defendant which delivery was to be in full payment for all the personal property transferred and for the assignment of the several leases therein described, with the proviso that the party of the second part, the present defendant, shall comply with all the obligations in the several contracts or leases assigned and that this defendant obligated itself to pay to the party of the first part for all phosphate and phosphate bearing rock then mined and upon the

premises at the rate of $1 per ton, and that the estimated amount was $250,000. Following this were provisions prescribing the time and method of payment for the rock lying upon the premises, with further proviso that when defendant had paid $250,000 and also the royalty reserved in the lease of Mrs. Martha G. Frierson and others, this defendant would be entitled to remove all the rock that had been mined regardless of quantity, and further provided that this defendant should have the right to mine and remove phosphate rock of a certain percentage if defendant elected so to do. There was a specific assumption by the party of the second part, this defendant, of the obligation to pay Mrs. Frierson and her lessors of the September 15, 1896, lease for all additional phosphate which might be mined at the rate of 15 cents per ton, and this defendant further promised to comply with all the requirements imposed upon the Blue Grass Company by the terms of that lease.

Continuing, the contract under consideration contained a provision that in the event of failure of this defendant to perform any of the covenants and agreements which this defendant had entered into and if such default should continue for a period of 30 days, the party of the first part may elect to treat the sale and lease as forfeited, and that the party of the first part should have the right after termination to enter upon the premises and take possession of the personal property and the contracts and properties embraced in the schedule, and that all the rights of this defendant should cease, and that all unpaid installments shall become due and payable.

A significant provision in this contract was this: That this defendant would endeavor to have George W. Killebrew, one of the parties to the original agreement and the trustee and likewise kinsman of the lessors under the phosphate Company's lease, made a director of this defendant and to become an employee of this defendant, and to be put in charge of all the rock mining operations of this defendant in Tennessee. The importance of this provision in determining the questions arising upon this record will become apparent when we arrive at a construction of the last contract involved in this controversy as showing the reasons why this last agreement was executed.

Complainant alleged the execution of a contract bearing the date of September 24, 1912, purporting to be an agreement between Mrs. Martha G. Frierson, George W. Killebrew and John S. Frierson, trustees under the will of James Granberry, and further purporting to be a contract between these three parties as trustee, and this defendant, which agreement was to be submitted to the Chancery Court of Maury County for approval. The first section of this contract is to the effect that the parties of the first part therein had sold to the party of the second part all the phosphate existing in or on a certain area known as the "glass field," this latter being a tract of land which had been acquired by John S. Frierson, Jr., from one McMillan,

but which had become a part of the trust property. This contract embraced agreements respecting the places wherein mining was to be carried on, and likewise the obligation of the party of the second part to prospect and to stake out areas to be mined with the proviso that all the phosphate remaining in the "glass field" and not measuring up to 72% in grade shall remain the property of the parties of the first part, with further provision that the party of the second part, the defendant herein, should have the right to wash and put through their number two Blue Grass Plant the phosphate mined from the Ingram place and to mix this phosphate with the rock taken from the Frierson estate, and that this defendant should not put through said plant or mix rock from any other lands except upon the written consent of the parties of the first part.

There was a provision to the effect that the parties of the first part had agreed to sell to the party of the second part all that portion of the phosphate which had been mined and was in ponds numbers 1 and 2, or any phosphate that might be thereafter deposited in any of the ponds that had been mined from the Frierson land should become the property of the party of the second part with the right to remove the same, but that the party of the second part should pay 15 cents per ton and the amount provided for in the original contract was to be mined.

There was a provision in this contract that the party of the second part should mine all the phosphate under a certain part of the glass field, and that the party of the second part obligated itself to remove the phosphate as mining progressed and not to leave an unreasonable amount of phosphate behind, and that as soon as the phosphate is mined and as mined the territory that had been mined to be surrendered. It is further provided that the party of the second part would, at an early date, bring a proceeding in the Chancery Court for confirmation of the agreement. There was compliance with this provision.

Pursuing our historical statement we now approach the agreement the meaning and effect of which furnishes the basis in the main of this controversy. This instrument is declared to be as of January 1, 1915, but it was not executed until March 27th and not recorded until May 22nd of the year 1915. That portion of this contract which should probably be called the beginning, is in substance: That it was entered into by and between this defendant, party of the first part, and George W. Killebrew and John S. Frierson, as trustees under the Will of James Granberry, and Mrs. Martha G. Frierson and George W. Killebrew in his own right, and his wife, and John S. Frierson, Jr., individually, all of whom were designated as the parties of the second part.

The obligatory provision of this contract now to be noticed is in part in the following language: "For the consideration hereinafter

mentioned and in consideration of the mutual covenants herein, party of the first part, being the defendant to this action, sells and transfers unto George W. Killebrew and John S. Frierson, Trustees, the rights, title and interest which the party of the first part had in a certain parcel of land known as the Terrass Place and embraced in the Blue Glass Phosphate Company contract (and designated by us as the second agreement under consideration) bearing the date of September 15, 1896, to which reference is here made for more accurate description, together with all the right, title and interest which the party of the first part has in a certain phosphate plant and other improvements known as Blue Grass Plant No. 1, and also the interests of the party of the first part in a certain contract between the Ruhm Phosphate Company, the vendees or assignees of Killebrew and Frierson assuming all the obligations resting upon the party of the first part under that contract and obligating itself to remove any lien or encumbrance upon the Ruhm property, and the party of the first part further undertook to cause or procure the Independent Phosphate Company to transfer to Killebrew and Frierson, trustees, the fee simple title to certain lands lying in the Second Civil District of Maury County; and known as the Satterfield Place.''

The contract further recited that the conveyance was made subject to a certain contract between the Independent Company and the Natural Phosphate Company, but with the promise of the party of the first part to assign all the rights which it had had under the contract with the Independent Company. The party of the first part to this contract of January 1, 1915, further agreed that it would procure releases and removal and discharge of all encumbrances other than those imposed by the lease contract.

It was further specified that certain negotiations have been pending for the sale of the Satterfield Place, and that it was the desire of the parties of the second part that such sale now agreed upon be executed. It was recited the Independent Company will upon request execute a deed conveying the Satterfield lands to the trustees aforesaid for the contract price of $10,000 provided the agreement be ratified by the Chancery Court.

It was further provided that the party of the first part agrees to pay Killebrew and Frierson the sum of $6,000 payable in three annual installments.

In the third section it is stated that the party of the first part guarantees that the rents and royalties under the Ruhm contract and the Natural Phosphate Company and the Independent Company while operating the Satterfield Place, together with the amount that may be realized from the sale of said Satterfield farm, will aggregate $30,000 to be paid in the succeeding four years; and further provided that if the phosphate companies above-mentioned shall fail to comply with the terms of their contracts or otherwise forfeit their rights,

then the party of the first part shall enjoy all the rights reserved against the Independent Company under the contract, may secure some one else to operate the mines and remove phosphate from the properties upon such terms as the party of the first part may determine, or may operate the property itself so as to make said property make as good a return as possible, and to this end the party of the first part may modify such other contracts with the present parties and any amount derived from such corporations shall reduce the amount of the guarantee, and Killebrew and Frierson agree to join party of the first part in their endeavors to see that the obligations of the Ruhm Phosphate Company and the Natural Phosphate Company are as profitable as may be.

The pertinent parts of the fourth section of this January, 1915, contract are substantially in this language: ''In consideration of the above and the mutual covenants herein, parties of the second Part release International Agricultural Corporation, its successors and assigns, from any obligation to pay Fifteen Cents per ton or any other sum as royalty or otherwise on phosphate or phosphate rock to be mined from the lands coming from Mrs. Martha G. Frierson, under the will of her father, and also the several tracts conveyed to John S. Frierson, trustee, by Jones, Stockard, Grimes and Jennings on which lands the phosphate rock had been sold to the Blue Grass Company by a contract of September 15, 1896—that is to say, the International Agricultural Corporation being required to pay Fifteen Cents per ton as royalty on all phosphate rock mined from the said properties, in addition to the sum already paid, now, in consideration of the above, it and its successors and assigns are discharged and released from its agreement to pay said Fifteen Cents per ton or any further sum for any and all phosphate material or phosphate rock mined from said lands—that is to say, International Agricultural Corporation, its successors and assigns, shall hereafter have the right to mine and remove from said lands any and all phosphate rock and phosphate bearing material without any further sum whatever, providing that all the rock mined from this territory will be mined at first mining. That is to say, the party of the first shall not after having mined from any given territory be permitted to return to the same for the purpose of mining, but shall mine and remove all the rock which it desires to mine in the first process of mining, and all land not needed for mining purposes or other privileges or easements herein granted, may be used by the owners for farming purposes.''

Continuing, we take from this January, 1915, contract the seventh and eighth provisions: ''A lien is hereby expressly retained upon any and all of the said phosphate rock and phosphate material which may be in the ground and unmined at any time party of the first part may be or become in default in meeting or carrying out its guarantee

in regard to the payment of said $35,000.00, but nothing herein shall prevent, hinder or delay the mining and marketing of any of said phosphate rock so long as the party of the first part is not in default under the terms of said guaranty. Eighth. This contract shall cease and terminate at the expiration of thirty years from this date, provided however that if the said party of the first part, its successors or assigns shall desire to continue its mining operations and the exercise of said other easements and privileges on said land after a period of thirty years, then said party, its successors or assigns shall mine as much as 3000 tons of 2240 pounds each per year for each year it so continues, and shall pay a royalty of Fifteen Cents per ton for each ton of phosphate rock so mined, and in case of failure to mine such amount, will pay said royalty as though the same had been mined. After said period of thirty years the royalty for the rock mined each year or said minimum royalty shall be paid at the end of each year, and if the same is not paid within thirty days from the time it is due then this contract shall terminate. In the event party of the first part, its successors or assigns shall desire and elect at any time to surrender its rights in said properties, it shall execute a release of its claim against said property and put the same of record in R. O. M. C.''

In the last paragraph it was stated that the contract was subject to ratification by the Chancery Court of Maury County.

Complainant alleged in her original bill that the contract of January 1915, was but an extension or enlargement of the contracts which has preceded its execution, and that it did not annul or supersede those former contracts; that defendant had breached certain provisions of the preceding contracts when construed in connection with the last one and had forfeited all rights under its several leases or contracts, and that complainant was entitled to a decree removing the claims as a cloud.

She further advanced the proposition that defendant was under an implied obligation, if not an express obligation, to mine the property diligently and profitably, and that it had failed and neglected to do so for many years, and further that it had abandoned all rights under the leases or contracts, and that its rights should be declared forfeited.

Another contention advanced by learned counsel was that the contract was lacking in mutuality in that it could be terminated at the option of the defendant and was therefore a nullity.

The answer of the defendant was in substance that the contract of January 1, 1915, embodied all the rights and obligations of the parties and was an independent contract, and that it was not affected and had no relation to the obligations prescribed in the previous contracts; that by the terms of the last instrument it acquired the absolute right to mine or not mine as it might choose, for the period of

thirty years from date of execution, and that it was executed from paying any royalty; that the consideration was computed with reference to and in lieu of the payment of a specific sum per year, and that it was under no obligation to pay any royalties until the expiration of the thirty-year period, and that it lost nothing by reason of its failure to operate; and that complainant was estopped by the conduct of her predecessors in title.

It further advanced the proposition that complainant and her predecessors had given this interpretation to the contract and had acquiesced in this construction; that their conduct was such as justified defendant in believing that this was the real intention of the parties.

Some evidence about which we shall make comment later was introduced.

The Chancellor decreed in substance as follows: That the contract of January, 1915, was an independent contract and superseded the three preceding instruments set out or referred to in complainant's bill; that the defendant became entitled to all the mineral rights in the lands covered by the two former contracts and might retain the same for thirty years, and was under no obligation to work the property; that defendant had paid a lump sum in lieu of royalties for the purpose of holding the land for thirty years without operation, and that it was under no obligation to mine during said thirty years, and that this contract, approved by the Chancery Court of Maury County was binding.

The Chancellor further held that the construction placed upon the contract of January, 1915, during the lifetime of the husband of complainant and during the lifetime of Geo. W. Killebrew, and until 1930, was that defendant was in no way obligated to mine or to pay any royalties from date of execution and for a period of thirty years, and that the fact that there was no mining, except some few efforts in 1922, 1923 and 1924, was not treated as any ground of default or forfeiture by defendant, and that the testator John S. Frierson, Jr., knew that no mining had been done, except as was stated.

The Chancellor further adjudged that defendant had not breached its obligations in any respect, and had not abandoned its rights, and had complied with all the terms and conditions of the contract, and he proceeded to dismiss complainant's bill.

The Court further declared that he was unable to determine what particular areas had been mined by defendant since January 1, 1915; that defendant had no right to remine any of the property which it had once mined, but the Court was unable to determine the exact spots or areas that had been mined over. But the Chancellor did adjudge that the contention of complainant in this respect was well founded and denied specific recovery for the reason that the par-

ticular tracts or parts that had been worked were not shown by such definiteness as to enable him to make a definite order or pronounce an adjudication.

The Chancellor undertook to find and did find certain facts, to-wit: that a controversy had arisen prior to March, 1915, between defendant and the Jackson Phosphate Company respecting the using of the output of the latter company at the mining plant which the Blue Grass Phosphate Company had sold to this defendant; that Mr. Killebrew, one of the trustees, had approached a representative of defendant and had suggested a way whereby the difficulties might be solved, Mr. Killebrew being interested in bringing about harmony and in helping the Jacksons, to whom Mrs. Killebrew was related; that there ensued some negotiations, Mr. Killebrew representing the estate participating therein; that after an interview or two it was suggested that this defendant instead of paying annual royalties should pay to or for the trust estate a lump sum, with the understanding that it might refrain from or not be required to mine upon the Frierson estate for a period of thirty years, defendant in the meantime agreeing that it would use the product of the Jackson lands until exhausted, and that this prompted the execution of the contract of January 1, 1915, which contract was submitted to the Chancery Court of Maury County and was expressly approved, and that this 1915 contract was a new contract operative for a period of thirty years from its date, and that defendant complied with the contract with the Jacksons that was the prompting consideration for the entering into of the contract of 1915.

Our labor will be shortened by treating in their order the several assignments of error presented and ably argued and briefed by learned counsel for appellant.

In the first and second specifications appellant contends that the Chancellor was in error in holding that the contract bearing the date of January 1, 1915, superseded the two previous contracts of September 14, 1896, and September 24, 1912. It is urged in this connection that these three papers should be treated as embodying one contract and should be looked upon as one instrument, and that the 1915 contract should be construed as not annulling but merely supplementing those previous agreements.

We have given much thought to this contention. We are driven to the conclusion that the learned Chancellor was correct in holding that the last, or 1915 contract was in substance an independent agreement and that it superseded the previous contracts. We hold that the provisions respecting the payment of royalties and the clauses bearing upon the obligation to mine, and the prescribing of conditions of forfeiture embraced in the previous contracts were eliminated, and that there was substituted therefor an entirely new arrangement to which effect must be given.

We further rule that this new or modifying arrangement was based upon a valuable consideration, and that it was adhered to for so great a length of time as to estop complainant to insist at this late date upon a construction wholly at variance with the wording of this 1915 agreement.

A careful reading of the paper as a whole has convinced us that the intention of the parties was to enter into a new contract. This, like all other questions, is one of intention. When we take into consideration the provisions of the agreement and the situation with which it dealt, confirmed by a long line of conduct, we can reach no other conclusion than that it was the intent and purpose of the parties to stipulate for an entirely different method of payment of royalties, and to change the matter of payments and to substitute certain privileges and provide certain duties that in every respect were in conflict with those embraced in the previous contracts.

It is urged in the third specification that the Chancellor was in error in ruling that the defendant, pursuant to the contract of January 1, 1915, paid a lump sum in lieu of royalties for a period of thirty years and became, because of that payment, entitled to preserve all of its mineral rights for said period of thirty years without doing any mining.

It is clear to us, giving a reasonable interpretation to the language of the contract, that the parties must have entered upon a discussion of substitute arrangements whereby defendant for a substantial cash payment acquired the right to enter upon or hold the lands and to mine thereon or to refrain from entering for a period of thirty years from the date of the agreement and that defendant lost nothing by neglecting or declining to keep up mining activities during the period embraced in the contract.

In order to avoid repetition we shall refer to undisputed testimony to the effect that Mr. Killebrew, one of the trustees having some sort of interest morally or otherwise in the Jacksons, suggested this substitution; and that the amount to be paid by way of rental or royalty was discussed between them, and that the sum to be so paid was arrived at by some sort of computation based upon the amount which the lessors were receiving or had a right to receive under the original contracts. In other words, the Chancellor was warranted in finding and holding that they arrived at this lump sum payment for the purpose of compensating the lessors for the right or privilege of mining their property for a period of thirty years, but with no obligation in the defendant to do anything other than comply with its agreement to pay $35,000. We reiterate that when the contract is considered as a whole this construction is justified by the contract and the clarifying evidence and by the law. The conduct of the lessors and their successors is not to be explained other than upon the hypothesis that defendant's rights acquired by

its contract were not dependent upon mining activities or further payment of royalties, and that it acquired the right as a qua :i owner to close its mines and do nothing about mining until the expiration of the thirty-year period prescribed by this contract. Had it been otherwise, that is, if the minimum royalty provided by the old agreements were still in effect, royalties accruing in the years 1916, 1917, 1918, 1919 and subsequent years would have accrued under the old contract and if not paid there would have been repeated demands for payment at the peril of an action of forfeiture. We infer likewise that there were no royalties paid for some little mining done in 1922, 1923 and 1924. Why were they not paid unle.:s they had been surrendered and a new agreement accepted in lieu? .

Another matter of moment is this: It was shown by the evidence that after the contract of 1915 defendant operated the Blue Grass Plant No. 3 exclusively for the benefit of the Jackson Phosphate Company, continuing this method of operation until the year 1930, and not using any phosphate from any of the Frierson lands. This of course was known to complainant's predeces;ors in title and particularly the trustees of the estate. This would not have prevailed or been observed had there been a binding contract for the payment of annual royalties.

■■ Much stress has been placed by learned counsel for appellant upon the fact that there was reference in the 1915 contract to the previous agreements;, and he insists that this should be so construed as incorporating into the last contract the provisions of the former; or at least it should be construed as an understanding that the previous agreements would survive and continue. We are constrained to dissent from this view. A reference to a former paper for descriptive purposes is in no sense a re-adoption of the former provisions; and it certainly cannot have the effect of importing into a new contract the conditions and limitations of the former agreement. See American Fruit Growers, Inc., v. Hawkinson, 21 Tenn. App., 127, 106 S. W. (2d), 564; Housekeeper Publishing Co. v. Swift, 8 Cir., 97 F. 290. We are of opinion that this limited reference is of moment in determining the question as to whether the provisions of the old contract were to be kept alive. If such was the understanding of the parties, why was there not inserted a specific provision to that effect? Whether a later contract is to be deemed an independent one or to become incorporated with or correlated to the old agreement is to be determined by the intention of the parties as expressed in the later agreement. Lewis v. Western Assurance Co., 175 Tenn., 37, 139 S. W. (2d), 982. Apropos is the rule if interpretation resorted to when there have been many legislative provisions upon one subject. The canon is to the effect that when a later statute deals fully with the subject and is complete in itself and manifests an intention to regulate completely the subject of legis-

lation, the later act will be deemed an independent statute, and will supersede and repeal all previous enactments. A subsidiary rule of construction is that, although there be no reference to the prior laws, a subsequent statute embracing provisions that are contradictory of a previous enactment, the intention to substitute will be imputed. That there is such conflict between the provisions of the last contract and the previous ones respecting the payment of royalties and consequences of failure to pay as contracted is quite plain. Both cannot be operative.

In the fifth assignment the holding of the Chancellor that defendant had not defaulted with respect to any obligation imposed by the contracts of September 15, 1896, and September 24, 1912, and that it had not forfeited its rights, nor had abandoned its rights, and that it had complied with all the terms and conditions set forth in the contract of 1915. If it be held that the contract of January, 1915, is a document wherein the rights and duties of respective parties are set up, we are constrained to hold that defendant was at liberty to remain inactive insofar as actual mining was concerned until the expiration of thirty years from the effective date of the last agreement. That is, it could rest upon its title and rely upon its deed as a quasi owner of the estate conveyed to it, and that there has been no violation of any agreement of the contract, and certainly that the contemplated period of inactivity cannot be made the basis of a demand for forfeiture. Abandonment of estates is unknown to the law in Tennessee. A vendee is never presumed to have abandoned a title under a deed vesting him with title. It is true that the estate of a lessee may be regarded differently from that of a vendee of title. But it is known of all men that long time leases of real estate partake to a great extent the nature of deeds of conveyance and that no forfeiture will be declared by mere inactivity, in the absence of adverse claims or the inequitable visitation of damages upon the lessor. We shall refer to this subject after we shall have disposed of assignments numbers seven and eight. These we shall now consider.

The basis of the seventh assignment is a finding of some facts by the Chancellor respecting conditions, situations, difficulties, intentions and purposes that arose or had been suggested prior to the formation of the contract of 1915. In brief, the Chancellor found that a controversy had arisen between defendant and the Jackson Phosphate Company respecting the using of phosphate rock from the Jackson properties in carrying on the operating of a certain phosphate plant at which the rock was prepared for commercial use and shipment; that this conflict was the subject of discussion between Mr. Killebrew representing the Frierson trust estate and the representatives of defendant and the members of the Jackson Phosphate Company; that Mr. Killebrew in his representative capac-

ity, suggested to defendant the devising of an arrangement or plan whereby the Jacksons were to be satisfied and their desires responded to and that at the same time that this could be done by an arrangement whereby the trust estate would reap approximately the benefits that would accrue to the estate by the continuance of operations under the contracts of 1896, 1909 and 1912; that Mr. Killebrew suggested that they estimate the probable income for a period of thirty years and that defendant enter into an agreement whereby it would pay a sum that would approximate or. be equal to the total sum that could be realized from continuous operations by defendant and the payment by it of its previous obligation to settle the royalties annually; and that after these negotiations and conferences, the contract of 1915 was entered into.

In a subsection of assignment number seven and in assignment number eight it is urged by learned counsel for appellant that these findings of the Chancellor were erroneous and should be disregarded for the reason in the main that those findings were based upon wholly incompetent testimony. In further elaboration of these two assaults upon the findings of the Chancellor, counsel has copied extensively from the depositions of a Mr. Barr and Mr. Dortch, witnesses for defendant.

This evidence from these two witnesses may be summarized as follows: That there having arisen prior to January 1, 1915, a controversy between defendant and the Jackson Phosphate Company regarding the operation of Blue Grass Plant No. 3, and particularly with respect to the place from which the rock to be used should be taken or bought; that this controversy was one of some gravity such as prompted Mr. Killebrew, who seems to be interested in some degree (whether it be materially or otherwise need not be determined) in disentangling the two organizations from their dispute, to undertake the solution of the difficulties by proposing a new arrangement whereby there would be substituted for annual payments of royalties the payment of the lump sum of $36,000. A great deal of the testimony of these two witnesses involves detailed statements as to conditions and prospects and outlook of the prospective parties. That Mr. Killebrew had the authority to represent the trust estate and therefore be charged with knowledge of everything transpiring or obtaining at the time is in no place attacked. Hence in disposing of this question, as well as others arising in the case we must assume that Mr. Killebrew acting as trustee was empowered to enter into any new arrangement deemed by him fair, equitable and profitable to the beneficiaries of the trust. The Chancellor was not in error in refusing to strike this testimony and did not act erroneously in predicating his findings of fact in the main thereon. Such evidence is admissible in every case where the interpretation of a contract by a court of justice is

invoked. Another rule is with respect to any contracts that are in the least obscure that the Chancellor should put himself in the place and position of the contracting parties. In other words, he should project himself in imagination in media res and view the situation and obtain enlightenment as to motives of the parties in entering into the agreement which the Court may be called upon to expound. The authorities on this point are given in the blackletter text on page 744 of 17 Corpus Juris Secundum, Contracts, section 321, as follows: "Where the language of a contract is susceptible of more than one interpretation, but not otherwise, the court, in ascertaining the intention of the parties, may and should consider, and construe the contract in the light of the situation and relation of the parties and the circumstances surrounding them at the time of making the contract, the nature and situation of the subject matter, and the apparent purpose of making the contract." Of similar purport are three cases from this jurisdiction, namely, Nunnelly v. Warner Iron Co., 94 Tenn., 282, 29 S. W., 124; Neubert v. Messer, 15 Tenn. App., 210; Weatherly v. American Agricultural Chemical Co., 16 Tenn. App., 613, 65 S. W. (2d), 592.

 Learned counsel is mistaken in his contention ably urged that the testimony introduced either contradicted the contract of 1915 or made additions thereto. The testimony is really confirmatory and explanatory of the agreement and not contradictory. It certainly did not add anything to the rights or obligations of the contracting parties. The liberal and possibly criticisable view to take of this evidence is that it did make clear the motives of the parties in executing the contract of 1915 and to explain the reason for inserting in this contract a lump sum royalty rather than the payment of royalties annually. Even so, we do not think the Chancellor went beyond the approved rules by receiving this evidence. No one disputes the proposition that you cannot vary the terms of a written contract nor contradict it by oral evidence, but these rules do not restrain the Court from a survey of the whole situation and an ascertainment of that which the parties had in mind and the purpose or object to be obtained by a proposed agreement.

 We recur to that very cogent rule to the effect that a course of conduct pursued by the parties is the very strongest evidence of what the contracting individuals originally intended. Board of Education v. Board of Education, 160 Tenn., 351, 24 S. W. (2d), 899; Niles Land Co. v. Chemung Iron Co., 8 Cir., 234 F., 294.

In truth, the Chancellor was correct in his interpretation of the contract upon its face as manifested in those portions of his decree that are made the basis of assignments numbered one, two, three and four. In other words, the agreement seems to us plainly to be that of a promise to pay $36,000 for the phosphate rock within a certain area, which rock the lessee was at liberty to let alone until

it got ready or desired to carry on mining operations. If correct in this conclusion the evidence criticized could not have prejudiced complainant.

■ ■ The consideration for a contract is always open for explanation. The Chancellor therefore was not in error in receiving an explanation as to how this sum was arrived at and the reason why it was inserted. The seventh and eighth assignments of error are consequently overruled.

Our observations immediately above will dispose of and render needless special treatment of assignment number nine, in which it is complained the Chancellor was in error in refusing to hold that the contract of 1915 was but a supplemental contract. Nor is it necessary to make further response to the contention that it was the duty of defendant to mine diligently during the life of the contract, and that it forfeited its rights under the lease by its failure so to do.

■ One additional response may be made and that is that defendant paid liberally for the privilege of holding the property as lessee without any obligation to engage in mining, and that it might remain inactive until the expiration of thirty years, at which time the obligation to pay annual rentals became operative as provided in the contract of 1915. Pertinent are the cases of Weatherly v. American Agricultural Chemical Co., supra, Niles Land Co. v. Chemung, supra, and Neubert v. Messer, supra. These authorities all hold in substance that where the lessee has paid or agreed to pay a specific sum of money in lieu of recurring royalties and the money has been accepted by the lessor, this will be treated as ·a waiver upon the lessor of the right to insist upon a forfeiture for failure to mine or develop lands. See also Note, 11 L. R. A. (N. S.), 419, where it is stated that if the terms of the lease as a whole show that it was the intention of the lessor to accept a specific sum of money in lieu of development or mining upon the lands, the acceptance of the money will be treated as a waiver of the supposed right to insist upon actual development. There is, of course no room to quarrel with the rule that if immediate development and continued mining be in contemplation, and if that be the only source from which revenue is to be derived, there is an implied obligation of the lessee to mine and to continue to mine; but this has no application to a case where the parties have computed, or undertaken to compute the probable income from the payment of which the lessee binds himself.

■ Complainant is made in the sixth assignment that the Chancellor was in error in stating that there was no basis upon which the Court could determine what particular areas had been mined by defendants since the effective date of the contract of January 1, 1915. The Court had held, and properly so, that under the terms of the

contract defendant did not have, and does not now possess the right to remine any parcels of land which it had at any time undertaken to develop. We agree with the Chancellor that the record is not in such condition as that a clearly expressed decree could or can be pronounced. We are of opinion that the refusal of the Chancellor to undertake to find these areas does not preclude complainant from subsequent efforts so to show and to seek relief if defendant has or may subsequently undertake to mine over any of the property it has once developed.

As a precaution there will be inserted in the decree of this Court a provision that the dismissal of the bill of complainant shall not be to her prejudice with respect to the remining or second mining provisions of the contract.

That courts of equity should construe contracts so as to uphold them and prevent forfeiture, is a trite observation but it is one that cannot be too often repeated. It has been borne in mind throughout our consideration of this case.

Lastly, it is urged that the lease of 1915 should be declared void for lack of mutuality. This contention is predicated upon a provision in that lease near the latter end of it to the effect that if the party of the first part shall desire or elect at any time to surrender its rights in said properties it shall execute a release of its claims and put the same of record. There are however at least three sufficient answers. One of them is that complainant is demanding cancellation of an allegedly void instrument (See 12 C. J. Secundum, Cancellation of Instruments, sec. 33, page 991) without fulfilling the indispensable requirement of restoration of consideration or a substantial portion of it. 12 C. J. Secundum, Cancellation of Instruments, sec. 44, page 1003. Another repelling reason is that lack of mutuality cannot be made available for annulment of a contract if the consideration, whether of money or performance, has been paid or performed; or where there has been a substantial performance by the opposite party; or where there has been performance subsequent to the execution of the instrument. 17 C. J. Secundum, Contracts, sec. 100, pages 448, 449. An additional justification for denying this species of relief is found in the great length of time intervening between the execution of the contract and the demand and in acquiescence in the arrangement embodied in the contract. Besides the remedy of rescission, that is the withholding or granting of the remedy of rescission, rests in the sound discretion of the Chancellor. 12 C. J. Secundum, Cancellation of Instruments, sec. 77, pages 1077, 1078. We reiterate our conclusion that defendant bought and paid for its right to retain the leased premises without obligation to explore or develop them; that instead of paying an annual rental or royalty, it was expressly agreed that defendant pay an estimated sum of money ascertained

by an endeavor to compute the value of those accruals for thirty years, and that the payment of this sum carried with it and vested defendant with the right or license to mine or not mine on the premises as it might choose during that period, and that it would not be subject to the hazard of forfeiture if it did not dig for phosphate. Such an agreement must be looked upon as a contract whereby the parties have deliberately calculated the damages which might accrue or result from non-performance and it should be enforced as are stipulations for unliquidated damages for inaction during the life of the lease. See Weatherly v. American Agricultural Chemical Company, supra. It is significant that this provision seemingly enabling defendant to elect to rescind appears in that portion of the lease dealing with operations subsequent to the expiration of the thirty year period. The Chancellor did not commit error in declining to declare the lease to be void.

We are of the opinion that the Chancellor reached the correct result and that his declaration of rights was in accordance with the law. We therefore overrule all the assignment of error and affirm the decree of the Chancellor and direct that complainant and the sureties upon her prosecution and appeal bonds be taxed with the costs.

Crownover and Felts, JJ., concur.