FLIGHTLESS-N-BIRD FARM, INC.,  )
                               )
        Plaintiff/Appellee,    )            Appeal No.
                               )        01-A-01-9803-CV-00126
v.                             )
                               )        Cheatham Circuit
JOSEPH K. DUGHMAN,             )        No. 4775
                               )
        Defendant/Appellant,   )
                               )
v.                             )
                               )
FLIGHTLESS-N-BIRD FARM, INC.,  )
JAMES L. NEWELL, JAMES A.      )
NEWELL, CAROLYN NEWELL,        )
and DEBBIE NEWELL,             )
                               )
        Counter-Defendants/    )
        Appellees.             )

**FILED**

**January 21, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHEATHAM COUNTY CIRCUIT COURT

AT ASHLAND CITY, TENNESSEE

THE HONORABLE ROBERT E. BURCH, JUDGE

GARY M. EISENBERG
2417 Bell Street
P. O. Box 70
Pleasant View, Tennessee  37146
        ATTORNEY FOR FLIGHTLESS-N-BIRD FARM, INC.

JEFFREY L. LEVY
315 Deaderick Street
2075 First American Center
Nashville, Tennessee  37238-2075
        ATTORNEY FOR JOSEPH K. DUGHMAN

AFFIRMED AND REMANDED

WILLIAM B. CAIN, JUDGE

O P I N I O N

This case represents a contract dispute between a seller and buyer of emus. Flightless-N-Bird Farm, Inc., was a corporation in the business of raising, breeding and boarding emus.

On June 25, 1994, Mr. Dughman purchased a pair of emus from Flightless-N-Bird Farm, Inc. [FNBF]. The Emu Purchase Agreement, entered into by the parties does not contain an integration clause. It reads, in pertinent part, as follows:

> 1. <u>Purchase Price</u>. **OWNER** agrees to pay $30,000.00 for the following pair of four year old breeding pair of emus with the following micro chip numbers:
>
> Male <u>00-0114-FFCD</u>
> Female <u>00-0063-E321</u>
>
> **OWNER** will pay $20,000.00 upon execution of this Agreement. **OWNER** agrees to pay the remaining $10,000.00 within six (6) months. However, if the female EMU lays an egg before the expiration of the six (6) months, **OWNER** will agree to pay the remaining $10,000.00 within two (2) weeks of the first egg being ~~hatched~~ layed upon notice to **OWNER**.*[sic]*
>
> 2. <u>Boarding Agreement</u>. **OWNER** and **FNBF** have entered into a Boarding Agreement executed on the 25th day of June, 1994. **FNBF** shall provide the care, maintenance, and board for the breeding pairs pursuant to the Boarding Agreement.
>
> 3. <u>Health</u>. **FNBF** represents that on the date of purchase the breeding pairs are in good health and **FNBF** knows of no medical problems with the birds. Thereafter, **OWNER** shall be responsible for the health of the birds as referenced in the Boarding Agreement.

This agreement, dated June 25, 1994, contained neither express warranties nor disclaimers, and contemplated payment in full before December 25, 1994.

Mr. Dughman and FNBF also entered into a Boarding Agreement discussed on the same day of entry into the purchase agreement and bearing the date of June 26, 1994. This Boarding Agreement reads in pertinent part:

A.    **WHEREAS**, the **Owner** has this day purchased, by separate instrument, one pair 4 year emu, chip no. Female 00-0063-E321 male 00-0114-FFCD from **FNBF** with the intention of keeping said emus together as breeding pairs on **FNBF**, located at 2255 Bearwallow Road, Ashland City, Tennessee 37015 (Both emu pairs are hereinafter referred to as the **"Breeding Pairs"**).

\* \* \*

2.    **Board and Care.  FNBF** shall provide care, maintenance and board for the Breeding Paris *[sic]*.  This care, maintenance and boarding shall be all inclusive of all reasonably required feed, labor, housing, incubation, hatching, and other care which may reasonably and normally be required in the maintenance of such Breeding Pairs and all eggs and chicks produced therefrom.  **FNBF** shall not be liable for the loss of, or injury to the Breeding Pairs, or any chick or egg produced by such Breeding Pairs, or any error in judgment, mistake, effect or law, and is hereby released from liability with respect to the death of the Breeding Pairs or the value of one or both of the Breeding Pairs.

\* \* \*

5.    **Production Quantity.**  No production quantity or quality is represented or warranted with respect to the Breeding Pairs.  In no case shall **FNBF** be liable to the **Owner** for failure of production of the Breeding Pairs, or a reduction in the production of the Breeding Pairs.

6.    **Health.**  No representation is herein made, or warrant given by **FNBF**, express or implied, as to the health of the Breeding Pairs or the eggs or the chicks produced by the Breeding Pair, and no liability shall be attached to **FNBF** for the health of any eggs or chicks produced by the Breeding Pairs.

\* \* \*

9.    **Warranties.**  Each party hereto represents and warrants to the other that (I) it has all requisite authority and power to execute, deliver and perform this agreement; (ii) this Agreement, when executed and delivered will be the legal, valid and binding obligation of said party, enforceable in accordance with its terms; and (iii)  he making and performance of this Agreement has been duly authorized by all necessary action.  No other warranties, including but not limited to warranty of the Breeding Pairs['] health, life expectancy or production capabilities are given, express or implied.

The signatures on this latter instrument are dated June 25, 1994.

3

FNBF filed suit June 14, 1995. Among other items, the complaint alleged that Mr. Dughman had breached the contract for sale of the emus by failing to pay the $10,000.00. Mr. Dughman answered and counterclaimed, alleging as affirmative defenses failure of consideration, breach of express and implied warranties, and negligent misrepresentation. In his counterclaim for damages, Mr. Dughman sought rescission of the contract based on breach of implied and express warranties and violation of the Consumer Protection Act, requesting treble damages in accordance with Tennessee Code Annotated section 47-18-109. Tenn. Code Ann. § 47-18-101, et seq. The cause was tried before a jury June 5-6, 1994. After receiving their instructions, the jury returned a verdict in favor of FNBF in the amount of $10,000.00 and dismissed Mr. Dughman's counterclaims. Mr. Dughman appeals the verdict below, raising the following issues for consideration on appeal:

1.  Whether the trial court erred, as a matter of law in allowing the jury to use the second contract (the **Boarding Agreement**) to modify the terms of the first contract (the **Emu Purchase Agreement).**

2.  Whether the court failed to instruct the jury that, even had there been disclaimers of warranty in the Emu Purchase Agreement, and even had these been effective to address a claim under the Uniform Commercial Code, disclaimers are not affirmative defenses against a claim under the Consumer Protection Act.

3.  Whether the court failed to instruct the jury on "failure of consideration", which was a viable ground for rescinding the Emu Purchase Agreement.

In the interest of brevity and economy the last two issues will be considered in concert.

## I. Interpreting Multiple Writings

With regard to the first issue on appeal, Appellant Dughman correctly asserts one well-settled rule concerning multiple instruments. The question of whether a *later* contract is independent to or incorporated with a *prior* written agreement is to be determined by the intention of the parties as expressed in the later agreement. *Frierson v. Int'l Agric. Corp.*, 24 Tenn. App. 616, 148 S.W.2d

27, 35 (1940). Appellant's strategy is to argue for independent construction of the instruments. Absent a disclaimer, contracts for the sale of goods carry with them the implied warranty of fitness for a particular purpose and the implied warranty of merchantability. In addition, the testimony below reveals assertions by Mr. Dughman that Tony Newell had made express warranties regarding the emus in question. The Emu Purchase Agreement contained no such disclaimer. The Boarding Agreement, which in turn referenced the contemporaneous Emu Purchase Agreement, contained the disclaimers. If the Purchase Agreement were considered in a vacuum, without any disclaimer, the warranties are in force, and might serve as a valid defense to a suit for nonpayment.

In the case at bar, however, a jury of twelve persons considered two writings, executed *contemporaneously* and concerning the same or similar subject matter, with a view toward giving full effect to both writings. The question to be answered in this case is whether the parties intended the different documents to be considered in harmony with each other. *See Stovall v. Battel*, 619 S.W.2d 125 (Tenn. App. 1981). The jury instructions adequately address this question of intent:

> A contract can be made up of several different documents if the
> parties intended that the various documents would be one contract.

> * * *

> In interpreting the contract issues, you must construe the contract
> as written and cannot create a new contract for the parties. You
> cannot void or rewrite contracts just because they are ill-advised,
> the parties miscalculate future events, because the terms are harsh
> or because one of the parties is unwise in agreeing to them.

The instruction adequately commended the matter to the jury's consideration for a finding of fact. The jury apparently construed the writings in harmony and rendered the verdict from which Mr. Dughman appeals. Review of findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict. *Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9, 13 (Tenn. App. 1992); Tenn. R. App. P. 13 (1998-99). The testimony of Appellee, James Anthony Newell, provides ample basis for the jury verdict with regard to the intent of the parties. Mr. Newell testified:

> Q.    Mr. Newell, I hand you a set of documents there. Can you
> identify those documents for me?

A.    This document right here is the contract -- that [Mr. Dughman] signed when he bought the birds.

Q.    Is that the one that says Emu Purchase Agreement on top of it?

A.    Yes, sir.  The Emu Purchase Agreement.  Here.  This is the contract that he drew up for us.

Q.    And the next part -- portion of that set is the boarding agreement?

A.    Yes, sir.  This is the boarding agreement.  Now [Mr. Dughman] not only wanted to buy the birds, he wanted us to keep the birds on our farm because I guess he lives in the city and did own a place to put them. [sic]  So he wanted us to keep them on our farm and raise the birds for him.  And we were going to raise them, and we was going to split the chicks and stuff at the end of the season.  So he bought the birds and signed this contract, and then he signed this contract as a boarding agreement that -- that we would keep them and take care of them and feed them and keep them penned and everything.

Q.    Now, was that all discussed at the same time, that he would purchase them, and that you would board them?

A.    Yeah.  He wanted to buy a pair of birds from us.  He was going to purchase them, and he wanted us to keep the birds on the farm.

Q.    Now, were these agreements entered into at the same time?

A.    One says the 25th and one says the 26th but it was -- it was in that same period.

Q.    Now was it your understanding that this was all contemplated as one transaction?

A.    Oh, yes.  I mean it was -- we talked about it at supper.  I mean he bought the birds and wanted us to keep the birds.  And we talked about how much the birds would be and -- and he agreed to draw the contract up for that.  I already had a boarding contract here.  So he said we'll go with this boarding contract, and you keep the birds for me.


A fortiori, the court below had no choice but to consider these contracts in harmony, for it is equally well settled that when two instruments are shown to be part of the same transaction, they will be read together, each with reference to the other.  *Real Estate Management v. Giles,* 41 Tenn.  App. 347, 352, 293

6

S.W.2d 596, 599 (1956).

## II. Jury Instructions

The next two issues require an analysis of the sufficiency of the trial court's jury charge. This court will not invalidate jury instructions as long as those instructions accurately and fairly describe the issues before the jury. *See Street v. Calvert,* 541 S.W.2d 576, 584 (Tenn. 1976); *Sasser v. Averitt Express, Inc.,* 839 S.W.2d 422, 430 (Tenn. App. 1992). With regard to Appellant's first issue on appeal regarding jury instructions, Mr. Dughman asserts that the court failed to instruct that negligent acts can support a claim under the Tennessee Consumer Protection Act. The actual jury charge reads in pertinent part:

> A person may violate the Consumer Protection Law without having done so willfully or knowingly. The Court can only consider treble damages if you determine that the plaintiff willfully or knowingly violated the law.

> A person willfully violates this law when the person intentionally or consciously uses an unfair or deceptive practice or act prohibited by the law. A person knowingly violates this law when the person uses an unfair or deceptive practice or act prohibited by the law with actual awareness that the practice or act is false or deceptive. Actual awareness may be inferred when the circumstances, viewed objectively, would indicate that a reasonable person would have known, or have reason to know, of such falsity or deception. Recovery under the Tennessee Consumer Protection Act is not limited to intentional acts, but also contemplates negligent conduct.

The trial court clearly instructed as Mr. Dughman requested below.

With regard to Appellant's second issue concerning jury instructions, Mr. Dughman asserts as error the failure of the trial court to instruct the jury on "failure of consideration." It appears from our view of the record, that Mr. Dughman failed to request any instruction regarding this affirmative defense, which must be pled specifically at the outset. Tenn. R. Civ. P. 8.03 (1998). The record is devoid of any evidence that Dughman objected to the inaccurate jury charge prior to his Motion for New Trial. Dughman then alleges an inadequacy of the general charge on the elements of contract. In the absence of an objection or special jury instruction request, a party may not raise an omitted jury charge

as grounds for error on appeal.  Tenn. R. Civ. P. 51.02 (1998); *Rule v. Empire Gas Corp.,* 563 S.W.2d 551, 554 (Tenn. 1978).

The court's instruction as a whole addressed the consideration which passed between the parties.  The written instruments at issue recited the consideration which was to have passed between the parties. Although, as Appellant argues in its brief, the court did not instruct specifically on the effect of a failure of consideration on the disputed agreement, the jury could necessarily infer from the instruction as a whole that if any of the requirements of contract were absent, a contract would not exist, and therefor a breach of that contract would not exist.

When viewed as a whole, the instructions of the trial court were adequate. These questions of fact, submitted to and decided by a properly instructed jury, should not be undermined in this court.  In accordance with the authorities cited above, the decision of the trial court on the jury verdict should be and is hereby affirmed.  The cause is remanded for such further proceedings as are necessary. Costs on appeal are taxed against Appellant, Dughman.

_____

_

WILLIAM B. CAIN, JUDGE

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE

_____
HENRY F. TODD, JUDGE