IN THE COURT OF APPEALS OF TENNESSEE
AT  NASHVILLE
January 9, 2002 Session

# PAUL E. JOHNSON v. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE, AND LESTER L. WILLIAMS, JR., DIRECTOR OF THE DEPARTMENT OF WATER AND SEWERAGE SERVICES OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY.

Appeal from the Chancery Court for Davidson County
No. 99-1886-II    Carol McCoy,  Chancellor

———————————

No. M2001-00633-COA-R3-CV - Filed December 11, 2002

———————————

Paul E. Johnson, a Nashville real estate developer, filed a complaint demanding a refund for sewer access fees paid to the Metropolitan Department of Water and Sewerage Services.  A counterclaim was filed by Metro alleging Mr. Johnson executed a valid contract to contribute $1,000,000 toward the construction of the Mill Creek sewer trunk line, less the net amount of any excess access fees paid under a previous agreement.  Mr. Johnson denied the existence of a contract to share the cost of extending the trunk sewer link.  The trial court dismissed Mr. Johnson's claims and entered judgment in favor of the Metropolitan Department of Water and Sewerage Services for $688,942.88. Mr. Johnson appealed.

**Tenn.R.App.P.3 Appeal as of Right; Judgment of the Chancery Court
Affirmed**

Ash,S.J., delivered the opinion of the court, in which Ben H. Cantrell, P.J.,M.S., and Patricia Cottrell J., joined.

Carol D. Kilgore, Nashville, Tennessee, for the appellant, Paul E. Johnson.

Thomas G. Cross, Nashville, Tennessee, for the appellees, The Metropolitan Government of Nashville and Davidson County, Tennessee.

1

# OPINION

## I. Background

In 1988, Paul E. Johnson ("Johnson"/ "the developer"), a Nashville real estate developer, sought sewer access for a parcel of land that was eventually developed as the Bradford Hills and Holt Woods subdivisions. This property naturally drains into Mill Creek, a tributary of the Cumberland River. The Metropolitan Department of Water and Sewerage Services ("Metro") informed Johnson the sewer line nearest the property, known as the Whittemore Branch sewer, was nearing capacity. At the time, Metro believed the increased flow from proposed development would encroach upon the limited capacity of the Whittemore Branch natural drainage basin. Harold Delk, Johnson's engineer and agent for sewer project negotiations, wrote to Metro on August 1, 1988, and agreed for the developer to pay $1,000 per lot in lieu of the present $500 per lot access charge, to help finance any necessary enlargements or extensions of the Whittemore trunk line and construction of a new Mill Creek-Holt Creek trunk sewer.[1] Correspondence from Metro Director Buddy Williams to Harold Delk, dated March 17, 1989 clarified the $1,000 access fee proposed by Delk by designating $500 as participation in the construction of the Mill Creek sewer trunk and $500 as the sewer charge authorized by the Metropolitan Council through the Metro Charter. Mr. Delk's letter in response dated March 22, 1989 accepted the terms of the Whittemore Agreement. Johnson developed Bradford Hills and Holt Woods subdivisions as planned and paid Metro $394,500 over the succeeding years pursuant to the Whittemore Agreement.

Johnson originally planned to engage a contractor to complete the Mill Creek sewer extension, and Metro would contribute funds for part of the cost. Bids were let for the project but returned exceeding the authorized budget of $1.3 million and the project was not undertaken at that time. Negotiations continued between Metro and Johnson and his agents. On March 2, 1994, Metro wrote Johnson regarding his participation in the Mill Creek trunk sewer. Metro acknowledged they had no objection to capping Johnson's participation at $1,000,000 toward the cost of the project, less credit for the net amount previously paid for excess capacity fees under the Whittemore Agreement. Mr. Johnson wrote Metro on October 17, 1994 to memorialize the terms of the Mill Creek Agreement in a single document. Johnson modified the outlined formal agreement and signed the letter indicating his acceptance of the terms set forth therein. He also stated he would neither be subject to, nor the beneficiary of, any subsequent basis impact fees or participation by other users of the proposed sewer system, and all construction work on phase one would include plans by Anderson Delk and Associates, Inc. approved by the Water Department on June 14, 1993. The agreement by the parties was subject to construction of the sewer beginning not later than June 1, 1995. The Mill Creek Agreement was also contingent

---

[1] The trial court found Harold Delk was Johnson's agent for sewer project negotiations. Delk was prominently involved in negotiations with Metro on behalf of Mr. Johnson for both the Whittemore and Mill Creek Agreements. Johnson and Delk co-authored much of the project correspondence, which was frequently prepared by Delk's secretary and mailed from Delk's office.

upon approval of the Metropolitan Council.[2] Metro replied to Johnson's offer by letter dated December 27, 1994 as written confirmation of acceptance of the developer's latest modifications. However, Metro cautioned Johnson the project involved complex preliminary review of environmental and archeological issues. Consequently, they could not guarantee construction of the project would begin by June 1, 1995. On June 8, 1995, after the expiration of the June 1, 1995 deadline for beginning construction expired, Johnson voluntarily wrote Metro and offered to extend the date to begin construction until August 15, 1995. When construction had not begun by August 15, 1995, Johnson again wrote to Metro on August 30, 1995, stating, "if the Mill Creek Sewer can not be advertised for bids by September 15, 1995, I will have no choice but to withdraw my offer of one million dollars for the construction of this project." Metro advertised the project for bids on September 3, 1995. Metro then conducted a pre-bid meeting attended by Johnson's engineer, Harold Delk. The parties did not have any direct contact with each other after this meeting.

Excavation work began in April of 1996. Johnson observed the construction of the project throughout until its completion approximately three years later. Johnson did not contribute anything to the funding of the Mill Creek extension pursuant to the agreement with Metro and reflected in ordinance number095-1488. Furthermore, the developer demanded a refund of the excess access fees paid under the Whittemore Agreement four months after the Bradford Hills and Holt Woods subdivisions were connected to the sewer. Metro completed the project shortly thereafter and requested Johnson pay the outstanding balance under the Mill Creek Agreement. The developer claimed any obligation he may have had to make such payments terminated August 15, 1995 because construction was delayed. Johnson filed a complaint demanding a refund for the sewer access fees. Metro counterclaimed seeking enforcement of the Mill Creek Agreement as either a unilateral or bilateral contract or under unjust enrichment or promissory estoppel theories. Johnson denied the existence of a contract to share the cost of extending a trunk sewer link and claimed the excess access fees were paid under extortion or duress.

The trial court made the following findings of fact and conclusions of law: First, Johnson's claim that his obligation terminated on August 15, 1995 ignored the existence of a contract with Metro on that date. Second, an ordinance was passed, and Johnson was not entitled to cancel the contract by his silence. Third, Johnson may have been in a position to cancel the contract had he acted affirmatively. However, Johnson unilaterally and voluntarily demanded bids be let by September 16, 1995, and Metro complied with this demand. Consequently, Metro was in a position to have a binding contract at that time despite the fact construction had not started. Johnson's silence and acquiescence waived the provision requiring construction to begin by August 15, 1995. Fourth, Johnson continued to participate in the Mill Creek Branch extension in accordance with the terms of the agreement with Metro except for the payment of the additional monies he had promised. Fifth, it was evident from proof that Johnson greatly desired the Mill Creek Branch extension. Without his promise of $1,000,000, the extension would not have gone forward on a timely basis, benefiting Johnson. Sixth, Metro did

---

[2] Ordinance number 095-1488 authorizing the acceptance of an amount not to exceed $1,000,000 from Johnson for the installation of the Mill Creek and Holt Creek trunk sewers was introduced to the Metropolitan Council on June 20, 1995 and approved on August 3, 1995. However, the Metropolitan Council ordinance did not state all of the terms set forth in the letter of agreement.

not coerce Johnson to enter the agreement, nor was the agreement void for duress. Any duress felt by Johnson was the result of his acquisition of a parcel of land for development without prior inquiry regarding sewer capacity or availability. Seventh, Johnson's proposed payment toward the development of the Mill Creek Branch was properly made and accepted in accordance with Metro code §15.36.040 regarding developers who wish to fund construction or expansion of trunk sewers. The participation in the development came to fruition over a period of years, beginning with a $500 per unit payment that was later supplemented by the offer of $1,000,000 capping Johnson's contribution.

The trial court found there was a contract obligating Johnson to pay $1,000,000. This agreement was appropriately authorized by Williams on behalf of the Metropolitan Government and the contract was properly ratified by the Metropolitan Council by its ordinance. The requirements that contractual obligations be sworn to and executed by the participating parties were formalities waived by both parties. Johnson's actions ratified the agreement, where he requested the funds previously paid to Metro in excess of $300,000 be applied towards his $1,000,000 obligation. Johnson was given credit accordingly. The trial court emphasized these parties entered into a contractual agreement and concluded Metro was not entitled to equitable relief or recovery under a theory of promissory estoppel or implied contract. The trial court ultimately dismissed Johnson's claims and entered judgment in favor of Metro for $688,942.88. Johnson appealed.

## II. Statement of Issues

The following issues are before the court: (A) Whether the trial court properly determined Johnson breached a valid and binding contract requiring him to pay an agreed amount to Metro toward the cost of extending the Mill Creek trunk sewer; and (B) Whether the trial court should have determined Johnson was liable, in the absence of a binding contract, under principles promissory estoppel or implied contract.

## III. Analysis

A.    **Whether the trial court properly determined Johnson breached a valid and binding contract requiring the developer to pay an agreed amount toward the cost of extending the Mill Creek trunk sewer.**

Johnson asserts the trial court erred in determining he breached a valid and binding contract obligating him to pay the balance owing under an offer to contribute $1,000,000 to the extension of the Mill Creek trunk sewer. Instead, the developer argues his unilateral offer to participate in the sewer extension project expired when construction did not begin on August 15, 1995 and he is entitled to a refund of $395,000 previously paid to Metro. Johnson specifically challenges the enforceability of the agreement under four theories:

1. Whether the trial court erred by holding Johnson became contractually bound after the Metropolitan Council passed ordinance number 092-384 approving the developer's unilateral offer on August 3, 1995, even though Metro did not commence construction by August 15, 1995, or by any other date dictated by the time pressures of the developer's business.

2. Whether the trial court erred in holding Johnson became contractually bound by virtue of his writing of August 30, 1995, where he threatened to terminate his participation in the Mill Creek sewer extension unless Metro advertised the project for bids by September 15, 1995, followed by Metro's advertisement on September 3, 1995, when such advertisement was not proven to have been published in response to the developer's letter, and when bid advertisement was not a valuable benefit sought by Johnson but merely a preparatory act essential to the commencement of construction, when the tenor of the developer's August 30, 1995 letter did not reaffirm his prior expired offer nor incorporate it by reference, and Metro did not inform him that it had advertised the project nor seek any extension of the date required for the commencement of construction.

3. Whether the trial court erred in holding Johnson was contractually bound upon the theory that a metro ordinance provision authorized the Water and Sewer Department Director to enter into the contractual arrangement with the developer, where the understanding, as set out in correspondence, did not conform to the requirements of the cited Metro provision.

4. Whether the trial court erred in rejecting Johnson's claim of a right to a refund of the unauthorized sewer connection charges of $500 per lot, plus interest, imposed upon him in addition to the $500 capacity fee authorized by the Metro Code, where Johnson paid such amounts totaling $395,000 as the only way he could get sewer service, but insisted the amounts were paid under duress.

In contrast, Metro argues this dispute is a simple breach of contract case. Metro suggests the Mill Creek agreement can be construed as either a bilateral contract based on the parties' exchange of promises, or a unilateral contract arising from Johnson's offer and Metro's acceptance by performance.

The court will address each of these questions in turn.

**1. The Metropolitan Council's Authorizing Ordinance**

5

Johnson first challenges the trial court's determination he became contractually bound after the Metropolitan Council passed ordinance number 092-384 approving the developer's unilateral offer, even though Metro did not commence construction by August 15, 1995, or by any other date dictated by the time pressures of the developer's business. A unilateral contract arises from an offer calling for acceptance by performance of some act rather than by a return promise. Hutchinson v. Dobson-Bainbridge Realty Co., 217 S.W.2d 6 (Tenn. Ct. App. 1946). It is the performance of all required acts that converts an offer into a unilateral contract. Allen v. Elliott Reynolds Motor Co., 230 S.W.2d 418 (Tenn. Ct. App. 1950). Johnson maintains his offer to participate in the Mill Creek extension was a unilateral contract requiring acceptance through Metro's construction of the project. The developer argues Metro was under no obligation to accept a bid or proceed with construction. Johnson claims Metro must have commenced construction by a stated date, originally June 1, 1995, in order to bind him under the offer. When construction did not begin on that date, Mr. Johnson wrote Metro proposing an extension for the commencement of construction until August 15, 1995. Johnson acknowledges the voluntary extension of a new deadline constitutes a new offer where the offeree fails to meet the stated deadline. Robinson v. Tennessee Farmers Mut. Ins. Co., 857 S.W.2d 559 (Tenn. Ct. App. 1993). However, the developer disputes the trial court's finding the Metropolitan Council's adoption of the authorizing ordinance on August 3, 1995 created a contract because he suggests acceptance of the unilateral offer required the beginning of construction within the stated deadline. Johnson maintains there is no contract if the new deadline was not met. Id. Thus, he alleges the offer expired when Metro failed to begin construction by August 15, 1995.

Metro directs the court's attention to the *Restatement (Second) of Contracts § 45(2),* and suggests the doctrine of partial performance would preclude Mr. Johnson from revoking his offer. The doctrine of partial performance provides the offeror may not revoke an offer calling for acceptance via performance of some act once the offeree begins performance. The doctrine of partial performance would appear to be applicable to the Mill Creek agreement. The negotiation and construction of this complex sewer extension project involved the performance of many steps toward the project's ultimate completion over a period of nearly a decade rather than the performance of a single act.

Johnson's argument fails to consider the existence of a bilateral contract formed through the parties' exchange of promises and correspondence. A bilateral contract is based upon a conventional exchange of promises. In a bilateral contract, the promise on side is viewed as consideration for the return promise, and both parties are bound from the moment they exchange promises. Hutchinson at 9. Notably, if the offer does not specify how it is to be accepted, either a return promise or performance is effective. Metro directs the court's attention to Restatement (Second) of Contracts § 32, which provides, "In case of doubt, an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering performance, as the offeree chooses." Thus, the Mill Creek agreement may be viewed as a bilateral agreement, where Metro's December 27, 1994 letter accepting the offer posed in Johnson's October 17, 1994 letter created a contract that bound both parties at that time. These items of correspondence reflect the assent of both parties to the essential terms of the agreement.

This court affirms the trial court's holding Johnson became contractually bound after the Metropolitan Council passed ordinance number 092-384 approving the developer's offer to participate in the Mill Creek sewer extension.

**2.Mr. Johnson's August 30, 1995 Writing Threatening to Terminate Participation**

Johnson concedes the Chancellor correctly ruled the offer was voluntarily reinstated by his writing extending the date for the commencement of construction until August 15, 1995. However, the developer challenges the trial court's determination his subsequent writing demanding bids be let by September 15, 1995, or he would withdraw his offer of $1,000,000, kept the agreement alive. Mr. Johnson maintains the mere referral to a prior contract or offer does not incorporate the same by reference or re-state the old-offer. Frierson v. International Agricultural Corp., 148 S.W.2d 27 (Tenn. Ct. App. 1940). The developer insists the tenor of this writing did not reaffirm his prior expired offer nor incorporate it by reference. This court finds Johnson's writing, and Metro's compliance with this demand, support the existence of the contract. When offers have been made, and the actions of both parties indicate they believe there is a contract, this tends to compel the conclusion a contract exists. APCO Amusement Co. v. Wilkins Family Restaurants, Inc., 673 S.W.2d 523 (Tenn. Ct. App. 1984). The Mill Creek trunk sewer at issue was completed in 1998. Bradford Hills and Holt Woods subdivisions are connected to Mill Creek as well as the Autumn Oaks property owned by Mr. Johnson. Johnson argues these facts lead to the conclusion that Metro did nothing at all to indicate a contract was formed.

Johnson argues the advertisement was not proven to have been published in response to his August 30, 1995 demand, Metro did not inform him that it had advertised the project for bids, nor seek any extension of the date required for the commencement of construction. His demand for advertisement of the project for bids did not include notification of compliance. Furthermore, the developer's argument also overlooks the trial court's conclusion his writing constituted acquiescence and waiver of the provision requiring construction begin by August 15, 1995. Vested bilateral contract rights may be waived, such as where a seller has a duty to ship by a stated date and the buyer has a right to have the goods shipped by that date. The buyer may waive his vested right by continuing to demand shipment after the breach occurred. Petway v. Loew's Nashville & Knoxville Corp., 117 S.W.2d 975 (Tenn. Ct. App. 1938). Metro had a duty to begin construction of the Mill Creek sewer extension by August 15, 1995. Johnson had a vested right to performance on this date. Metro breached the terms of the Mill Creek agreement when construction did not commence by the stated date for performance. However, Johnson waived his right to performance by August 15, 1995 when he wrote Metro and demanded the project be advertised for bids by September 15, 1995 "or he would withdraw his offer of $1,000,000." The time for performance is converted to a reasonable time when waiver of the time for performance pursuant to a bilateral contract occurs. The party entitled to performance may establish a new performance deadline by giving reasonable notice of this requirement. Thompson v. Menefee, 6 Tenn. App. 118 (Tenn. Ct. App. 1927). Consequently, Metro was obligated to commence construction of the Mill Creek sewer extension within a reasonable time rather than some unspecified date dictated by the time pressures of the developer's business. The project was advertised for bids on September 3, 1995. The bids were evaluated, a contractor was selected and excavation work for the Mill Creek sewer extension began in April of 1996. This court finds construction commenced within a reasonable time after Johnson's demand for the project to be advertised for bids.

Nor is the court persuaded by Johnson's argument that advertisement for bids was merely a preparatory act conferring no benefit on the developer. Johnson compares this case to Savage v. Spur Distributing Co., 228 S.W.2d 122 (Tenn. Ct. App. 1949), a case considering an individual promised permanent (lifetime) employment as a corporate officer if he would relocate from St. Louis to Nashville. The court held moving to Nashville did not furnish consideration because it was not the objective sought by the company, but was merely a preparatory act necessary to accept the offer of employment. We do not believe permanent employment conditioned upon relocation is analogous to the negotiation and completion of a complex sewer construction project lasting nearly a decade. The parties in this case understood the extension of the Mill Creek would be a lengthy process. The developer's demand for the advertisement of the project for bids by September 15, 1995 reflected his continued desire for the construction of the Mill Creek sewer extension. Metro's compliance with this demand reflected their belief that a contract existed between the parties and their continued commitment to the project.

This court affirms the trial court's determination Johnson's subsequent writing demanding bids be let by September 15, 1995, or he would withdraw his offer of $1,000,000, demonstrated acquiescence and waiver of his right to performance by August 15, 1995. The developer's failure to designate a new deadline for performance converted the time the commencement of construction to a reasonable time. This court finds construction commenced within a reasonable time after Johnson's demand for the project to be advertised for bids.

**3.Authorization of Metro Director Williams to Enter Into the Mill Creek Agreement**

Johnson also argues the trial court erred in holding he was contractually bound upon the theory that a Metro ordinance provision authorized the Water and Sewer Department Director to enter into the Mill Creek agreement. The developer claims the understanding between the parties, as set out in correspondence, did not conform to the requirements of Metro Code § 15.36.040. Johnson further argues the excess access fees in dispute were unlawful, as they were not authorized by any Metro ordinance or Code provision. In support, the developer directs the court's attention to Lebanon v. Baird, 756 S.W.2d 236 (Tenn. 1988), where the Supreme Court held a contract was void and of no effect because the terms of the city charter provided this power could only be exercised through the enactment of an ordinance. Johnson suggests the decision in Lebanon v. Baird applies to any and every municipal action for whose achievement the charter provision requires an ordinance procedure to be followed.

The Metropolitan Charter empowers the Metropolitan Government to provide for the rates, charges, and assessments necessary for the operation of the water and sewer systems. The trial court acknowledged the Metropolitan Government may only enter contracts as authorized by the charter and the Metropolitan code. Under Title 15, regarding water, sewer and other public services, Metro Code § 15.36.040 "Capacity Charge" includes several important provisions.

A.    Notwithstanding any other provision of the Metropolitan Code of Laws to the Contrary, there is established a capacity charge of five hundred dollars per unit of flow on all new connections where public sewers do not exist, as of the effective date of this section (February 21, 1984). The charge shall apply, where sewers do exist, for all units of flow in excess of four per acre not to exceed a maximum charge of twenty-five thousand dollars per acre. This capacity charge shall be distinguished from and collected in addition to the existing tap fee required by § 15.36.020.

B.    Trunk sewer construction or expansion funding by the Metropolitan Government shall be only upon the basis of availability of funds. If developers fund construction or expansion of trunk sewers, the Metropolitan Government shall collect the charges created herein in accordance with subsection F, below. Nothing in this subsection shall be construed to create any obligation on the Metropolitan Government to fund in whole or in part the construction or expansion of trunk sewers.

C.    The charges established herein shall be placed in the extension and replacement fund of the Metropolitan Department of Water and Sewerage services.

F. All charges established by the enactment of this section shall be due and payable prior to issuance of a permit for service connection to the public sewer. If a developer prepays any part or all of the fee charge, such payments may be indicated with filing of the property subdivision plat or other duly recorded instrument. This contribution may be in the form of cash payments or equivalent construction cost. In the event a developer contributes, in equivalent construction cost, an amount greater than the charge established by this section, such developers shall be reimbursed for such contribution to that extent when the department collects other applicable fees from properties served by the project. Any such reimbursement shall be made only after the Metropolitan Government has been reimbursed for the entirety of its costs. The Department of Water and Sewerage services shall keep permanent records for each project, and all contractual obligations shall be sworn to and executed by the participating party. The director of the Department of Water and Sewerage services is authorized to enter into said agreements on behalf of the Metropolitan Government.

The trial court concluded Metro Director Williams was authorized to enter the Mill Creek agreement with Johnson under subsection F: "The director of the Department of Water and Sewerage services is authorized to enter into said agreements on behalf of the Metropolitan Government. Subsection F also specifically contemplates the possibility that developers may be required to participate in the funding of a trunk sewer extension beyond the $500 capacity charge: "In the event a developer contributes, in equivalent construction cost, **an amount greater than the charge established by this section**, (emphasis added) such developers shall be reimbursed for such contribution to that extent when the department collects other applicable fees from properties served by the project. Any such reimbursement shall be made only after the Metropolitan Government has been reimbursed for the entirety of its costs." This court rejects Johnson's contention that situations such as the Mill Creek agreement, where developers may be required to contribute excess access fees, are unlawful. This arrangement was specifically provided for within Metro Code § 15.36.040(F).

Johnson also claims the understanding between the parties, as set out in correspondence, did not conform to the requirements of Metro Code § 15.36.040 because the excess capacity fees were designated as non-refundable.  The following language in subsection (F) is implicated: "In the event a developer contributes, in equivalent construction cost, an amount greater than the charge established by this section, such developers shall be reimbursed for such contribution to that extent when the department collects other applicable fees from properties served by the project.  Any such reimbursement shall be made only after the Metropolitan Government has been reimbursed for the entirety of its costs."  The developer correctly indicates subsection (F) provides for mandatory reimbursement of excess access fees, but *only* after the Metropolitan Government has been reimbursed for the entirety of its costs.  The failure of the Mill Creek agreement to follow this requirement may render the clause regarding reimbursement of the excess access fees unenforceable.  However, the failure to follow this requirement does not render the entire Mill Creek agreement unenforceable.  This court refuses to ultimately rule regarding the enforceability or severability of the reimbursement clause as this issue was not considered at trial.  This court affirms the trial court's determination Metro Director Williams was authorized to enter into these agreements with Mr. Johnson on behalf of the Metropolitan Government in spite of the clause regarding the reimbursement of excess access fees.

**4. Duress**

Finally, Johnson objects the excess access fees were unlawful as they were paid under duress. The developer complains he was in a position that gave him no alternative but to agree to these charges since his real estate development required sewer access. However, the trial court noted Johnson was not placed in that position by the actions of the Metropolitan Government. Johnson acquired, by option, a parcel of land he wished to develop without prior inquiry regarding the capacity or availability of sewer access. The trial court declared the developer's duress was of his own making. The trial court found Metro did not impose any duress upon Johnson.

Johnson remarks a public official's imposition of some requirement upon a citizen is legally void when law does not authorize the requirement. Bradley v. State, 222 Tenn. 535, 438 S.W.2d 738 (1969). However, as this court has previously stated, the imposition of the excess access fees by Metro Director Williams was specifically authorized by Metro Code § 5.36.040. The developer also directs the court's attention to this Court's decision in Reynolds v. Metropolitan Nashville - Davidson County, 1991 Tenn. App. LEXIS 123. Johnson declares official action done without authority and using governmental power to financially benefit a municipality or its officials by gaining assent to a protective contract constitutes duress and the contract is rendered illegal. However, the Reynolds case examined a threat to proceed with pending criminal charges in order to compel a defendant to sign a release of his rights under a personal injury claim after being shot by an officer. This court does not find Johnson's allegations of duress analogous to the personal fear or threat of imprisonment considered in Reynolds.

Furthermore, Johnson was free to reject the Mill Creek agreement if he objected to the excess access fees. The developer could have refused to proceed with the development of this parcel of land until more advantageous conditions were present. Likewise, Metro was under no obligation to extend the Mill Creek trunk sewer to Johnson's planned real estate development. Metro Code § 5.36.040(B), specifically provides: "Nothing in this subsection shall be construed to create any obligation on the Metropolitan Government to fund in whole or in part the construction or expansion of trunk sewers." Thus, Johnson freely chose to execute the Mill Creek agreement because it was financially in his best interest to participate in the construction of the sewer extension. This court affirms the trial court's determination Metro did not force Johnson to execute the Mill Creek agreement under duress. This court concludes the Mill Creek agreement is valid and binding. Finally, Johnson also claims a constructive trust should be imposed on the excess access fees since they were obtained under duress. This court finds this issue is inapplicable as we affirmed the trial court's determination Metro did not force Mr. Johnson to execute the Mill Creek agreement under duress.

**B. Whether the trial court should have determined Johnson was liable, in the absence of a binding contract, under principles promissory estoppel or implied contract.**

Alternatively, Metro argues they reasonably relied upon Johnson's promises to pay an agreed share of the cost of the Mill Creek sewer extension and Johnson received a benefit from the project's completion. Metro argues Johnson is obligated to keep his bargain even if no express contract existed. However, the issue of promissory estoppel or implied contract is moot,

as this Court has previously affirmed the trial court's determination a binding contract obligated Johnson to contribute $1,000,000 to the cost of the Mill Creek sewer extension.

## IV. Conclusion

This court affirms the trial court's determination a binding contract existed between Johnson and Metro and the corresponding rejection of recovery for Metro under theories of promissory estoppel or implied contract. Johnson was obligated to contribute $1,000,000 toward the cost of the Mill Creek sewer extension under the terms of the Mill Creek agreement less credit for his previous participation. The trial court correctly dismissed Johnson's claims and entered judgment in favor of Metro for $688,942.88. The judgment of the trial court is affirmed. The cost of this appeal shall be assessed against the appellant.

_____
ASH, S.J.