IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 21, 2003 Session

## R. SCOTT MARTIN v. JOHN CURTIS KING

**Appeal from the Chancery Court for Scott County**
**No. 8407     Billy Joe White, Chancellor**

---

**No. E2002-03055-COA-R3-CV**

---

This is a breach of contract case. R. Scott Martin ("Plaintiff") sued John Curtis King ("Defendant"), alleging that Defendant had breached his agreement to give Plaintiff a 3% interest in Defendant's landfill venture. The trial court found that the parties' agreement did not pertain to or cover the particular landfill business out of which Plaintiff sought a 3% interest. The trial court did conclude that Plaintiff was entitled to a judgment against Defendant for $4,500 for monetary contributions made by Plaintiff in connection with the parties' agreement. Plaintiff appeals, contending that the trial court erred in finding that a novation had occurred, in admitting parol evidence, and in calculating damages. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Philip R. Crye, Jr., Clinton, Tennessee, for the appellant, R. Scott Martin.

Johnny V. Dunaway, LaFollette, Tennessee, for the appellee, John Curtis King.

**OPINION**

I.

Defendant began his career in the garbage business in 1970. Five years later, he first attempted to establish a landfill in Scott County, but to no avail. In the late 1980s, Defendant hired an attorney to assist him in his second attempt to develop a landfill, which he referred to as the Roberta Sanitary Landfill. Around the same time, Defendant signed an option to purchase approximately 1,200 acres in Scott County for the landfill site. On January 3, 1989, Defendant filed a Disposal Facility Permit application in his own name with the Tennessee Department of Environment and Conservation ("the TDEC"). However, the TDEC never acted on his application.

In addition, Scott County, acting pursuant to Tenn. Code Ann. § 68-211-701 (2001), denied Defendant the right to construct the landfill at that time. Defendant then filed suit against the county, challenging the county's action in denying the landfill permit.

By the end of 1990, Defendant had borrowed over $250,000 to develop the landfill, and he was in need of another $3,050,000 in order to complete the landfill, re-option the 1200 acres, and hire an attorney. Defendant apparently told his son, Steve King ("King"), of his financial difficulties, and King relayed this information to Plaintiff, who was sharing a house with King at the time.[1] According to Defendant, Plaintiff represented to him that "he was going to get a three million dollar investor" for the landfill. After speaking with Defendant and ascertaining his needs for the project, Plaintiff contacted a few potential investors and researched waste companies. In addition, he obtained contact information regarding an attorney, George Dillard ("Dillard").

On December 15, 1990, Plaintiff, King, and King's wife drove to Defendant's home in Oneida with a Letter of Agreement ("the Agreement") that had been prepared by Plaintiff's attorney. Defendant testified at trial that he was expecting King and that he was prepared to sign an agreement giving King 15% of Defendant's interest in the landfill in exchange for King's assistance in procuring investors. Defendant met Plaintiff for the first time when the group arrived at Defendant's home. At that time, King apparently asked Defendant to give Plaintiff a 3% interest in the landfill, thereby reducing King's interest to 12%. Defendant agreed. The Agreement states, in pertinent part, as follows:

> This Agreement, entered into this 15 day of December, 1990, between [Defendant] and [King and Plaintiff].
>
> * * *
>
> For and in consideration of services rendered by [King and Plaintiff] for and on behalf of [Defendant] in association with a landfill project located in Oneida, Scott County, Tennessee, [Defendant] does hereby agree to transfer and convey a twelve (12%) percent interest in his business known as "Roberta Sanitary Landfill" and the associated recycling business to [King], and [Defendant] does hereby agree to transfer and convey a three (3%) percent interest in his business known as "Roberta Sanitary Landfill" and the associated recycling business to [Plaintiff].
>
> * * *

The Agreement was then signed by Defendant, King, and Plaintiff.

---

[1] King and Plaintiff met in the late 1980s; Plaintiff was recently divorced and King was in the process of getting a divorce. The two men decided to share a house in order to save money.

Following the execution of the Agreement, Plaintiff stated that he continued to seek funding for the landfill venture. He and King delivered a $15,000 check to Dillard to retain his services for Defendant. While Plaintiff was able to procure a letter of intent to buy the landfill project from a company called United Waste, Defendant rejected the letter as a "ridiculous offer." In March, 1991, Plaintiff paid a $2,000 retainer to attorney Doug Overbey for his services in the landfill venture.

On June 14, 1991, Defendant signed a memorandum of agreement with the owners of the 1200 acres of land in order to preserve his option to buy the property. One year later, Defendant paid King $10,000 to repurchase King's 12% interest in the landfill project. Later that year, Defendant's litigation over the landfill project came to an end when the trial court held that the action of the county in denying the landfill permit was arbitrary.

In February, 1993, Defendant resubmitted his landfill application to TDEC; he listed himself as the applicant, as well as the Roberta Sanitary Landfill. In late 1993, Defendant stopped communicating with Plaintiff, and Dillard told Plaintiff that the Roberta Sanitary Landfill was "sitting still."

In 1995, Defendant formed a new corporation, which he called Scott County Solid Waste Disposal Company ("Scott Solid Waste"); Defendant was the sole shareholder of this corporation. Defendant formed the corporation for the purpose of purchasing the existing Scott County Landfill in Helenwood. By hauling waste from the surrounding counties to the Scott County Landfill, Defendant was able to make enough money to renew his application for the Roberta Sanitary Landfill. On April 29, 1997, Defendant was issued a permit in the name of Scott Solid Waste.

In order to get the landfill operational, Defendant was required to post a $6 million bond and install leach fields, pools, and composite, *i.e.*, "engineered clay plus synthetic," liners. Defendant was never able to raise enough money to complete these requirements. As a result, Defendant was forced to sell all of Scott Solid Waste's corporate stock and other company holdings to Liberty Waste Services ("Liberty"). Liberty purchased Scott Solid Waste in September, 1998, for $6 million – $4 million for the corporate stock and $2 million for the proposed landfill site. The owner of the proposed landfill site was paid $1.1 million, and Defendant, as the option holder, received $900,000. Defendant also received an initial payment of $1 million for the sale of his stock; the balance was to be paid in nine yearly installments of $150,000 each, with a final payment of $1.65 million due in 2008. After paying debts of more than $1.4 million, Defendant had just over $150,000 from his initial payment from Liberty.

On October 18, 1999, Plaintiff sued Defendant, claiming that the parties had an agreement whereby Defendant would give Plaintiff a 3% interest in the Roberta Sanitary Landfill. Plaintiff averred that Defendant breached that agreement by selling the Scott Solid Waste landfill business for $6 million and not giving Plaintiff the 3% to which he allegedly was due. A trial on the merits was conducted on August 13, 2002. At the conclusion of the trial, the trial court issued its ruling from the bench:

Gentlemen, I've listened to this case practically all day and counsel has done the best they could with what they have. You can't make the facts; you just have to present them. They have been presented very well under the circumstances. This is a [convoluted] mess. It seems like it would take an expert to mess up an agreement this bad.

[Plaintiff and King] found [Defendant] at a desperate time. He needed desperate measures. I guess this [Agreement] is a desperate instrument. It relates basically that [Defendant] had given [Plaintiff and King] a percentage of [Defendant's] business for things that [Plaintiff and King] have done. Of course, the fact of the matter is [Plaintiff and King] had done nothing, very little, to say the least, maybe a phone call or two, practically nothing at that time. These people clearly had an agreement that [Plaintiff and King] would provide investors, financing and help [Defendant] get this business sold and on the way. [Plaintiff and King] were unsuccessful generally in that. They made some efforts. They contacted people. None of them were experts in this type of thing and they did what they could. They got some people to look and nobody bought. This deal goes on for years through this lawsuit.

It's ungodly at the engineering and legal expense in this matter that this thing got to. Actually, got up in about 1995, it kind of got into a novation. [Defendant] got into [Scott Solid Waste] business and incorporated that business. It was totally separate from what these parties were originally involved in, totally separate, although [Defendant] personally kept working on this landfill and so forth.

By some measure, nobody knows how, this permit comes out in the name of [Scott Solid Waste]. They've never filed an application and nobody knows how it happened. All at once there is a permit issued.

It goes on for two or three years and [Defendant] eventually sells this business for a considerable amount of money, but had so much money in it that there was not near the kind of profit that you would think. With the judgments and the lawyers' fees and all he has had, [Defendant] will come out probably with some profit, but not a great deal. Not only is this landfill involved – you have to look – at the time [Defendant] had a pretty good business that he developed on the side with this Scott County Landfill, which is totally separate as far as anything to do with this [A]greement.

> The Court really generally feels that [Plaintiff and King] violated this [A]greement by not producing anything worthy of helping. They tried to help. I'm sure they did in good faith what they could, but they were unsuccessful in those efforts.
>
> [Plaintiff], apparently from the evidence, appears to have supplied two thousand dollars to Doug Overbey as counsel fees. The Court feels he is entitled to recover that. On a quantum meruit basis to try to be fair in this matter, because [Plaintiff] did some trips and efforts, the Court knows no other way to value his interest in this failed business the same as [King] was paid back in 1992, I think. Based upon that, [Plaintiff would] be entitled to recover twenty-five hundred of his contractual rights, if there is any such thing in this case, making the total judgment forty-five hundred dollars.

Plaintiff then filed a motion to alter or amend the judgment, contending that the award of damages was inadequate and against the preponderance of the evidence. The trial court denied the motion. From this judgment, Plaintiff appeals.

## II.

In this non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness that we must honor "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). The trial court's conclusions of law, however, are accorded no such presumption. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993).

## III.

Plaintiff raises three issues on appeal. First, Plaintiff argues that the evidence preponderates against the trial court's determination that the sale to Liberty was not a part of the subject matter of the Agreement. Second, Plaintiff contends that the trial court abused its discretion when it received testimony pertaining to discussions about Plaintiff's duties, which testimony, according to Plaintiff, varies the terms of the Agreement and is thus violative of the parol evidence rule. Finally, Plaintiff argues that the evidence preponderates against the trial court's determination that Plaintiff was not entitled to any damages in excess of the $4,500 awarded to him by the trial court.

## A.

At the conclusion of the trial in the instant case, the trial court, in issuing its ruling from the bench, made the following remarks:

It's ungodly at the engineering and legal expense in this matter that this thing got to. Actually, got up in about 1995, *it kind of got into a novation*. [Defendant] got into [Scott Solid Waste] business and incorporated that business. It was totally separate from what these parties were originally involved in, totally separate, although [Defendant] personally kept working on this landfill and so forth.

(Emphasis added). On the basis of these remarks, Plaintiff argues that the trial court erred in finding that a "novation" had occurred. Plaintiff asserts that, as a novation constitutes the substitution of one contract for another, all parties to the original contract must assent to the substitution. *See **Bank of Crockett v. Cullipher***, 752 S.W.2d 84, 89 (Tenn. Ct. App. 1988); ***Blaylock v. Stephens***, 36 Tenn. App. 464, 467, 258 S.W.2d 779, 781 (1953). Because, so the argument goes, Plaintiff never assented to the substitution of a new agreement for the original agreement, the original agreement remained in full force and effect and Plaintiff was therefore entitled to his 3% interest.

We begin our analysis of this issue by noting that the trial court did not make a finding that a novation had occurred. Rather, the trial court was merely stating that the situation in the instant case was *similar* to a novation in that Defendant's subsequent business dealings were completely separate from the business dealings contemplated under the Agreement. In fact, the trial court, after mentioning a novation, went on to state that Defendant's Scott Solid Waste business was "totally separate from what these parties were originally involved in."

We therefore construe Plaintiff's first issue as asking this court to find that the evidence preponderates against the trial court's determination that the sale of Scott Solid Waste to Liberty was not a part of the subject matter of the Agreement.

Our review of the Agreement and the testimony of the parties at trial convinces us that the sale of Scott Solid Waste to Liberty was not, in fact, contemplated by the terms of the Agreement. When the Agreement was signed and executed by the parties in December, 1990, the parties clearly intended that Plaintiff and King would assist Defendant in obtaining financing so that Defendant could start his landfill venture known as the Roberta Sanitary Landfill. Three years later, Plaintiff had done only a minimal amount of work for Defendant and had obtained virtually no financing for Defendant. At that time, communication between the parties ceased. *Two years later*, in 1995, Defendant formed a new corporation, Scott Solid Waste. The evidence is uncontroverted that Plaintiff had nothing to do with the formation of this new corporation. Defendant proceeded to purchase the Scott County Landfill and use the proceeds from that business venture to renew his landfill application. Eventually, Defendant was forced to sell the new landfill business to Liberty. Again, there is absolutely no question that Plaintiff had nothing to do with the purchase of the Scott County Landfill; the renewal of the landfill application; or the sale of the business to Liberty. There is a clear line of demarcation between the business dealings of the parties under the Agreement and the business dealings of Defendant which ultimately led to the sale of the business to Liberty. Accordingly, we find that the evidence does not preponderate against the trial court's determination that the sale to Liberty was not a part of the Agreement.

B.

Plaintiff next asserts that the trial court abused its discretion when it admitted into evidence testimony regarding oral conversations between Plaintiff and Defendant pertaining to services to be performed by Plaintiff after the execution of the Agreement. Plaintiff contends that this evidence varies the written terms of the Agreement and that its introduction into evidence at the bench trial below constitutes a violation of the parol evidence rule. Specifically, Plaintiff takes issue with the admission of statements that he assured Defendant that he could obtain a $3 million investor for the landfill venture.

The introduction of evidence at trial addresses itself to the discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). As we said in *Overstreet v. Shoney's, Inc.*, 4 S.W. 3d 694 (Tenn. Ct. App. 1999),

> [d]iscretionary decisions must take applicable law into account and must be consistent with the facts before the court. *See Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996) (holding that the trial court must give due consideration to the applicable law and facts). Thus, the appellate courts will set aside a trial court's discretionary decision only when the decision is based on a misapplication of the controlling legal principles or on a clearly erroneous assessment of the evidence.

*Id.* at 709 (citations omitted).

The parol evidence rule provides that testimony of prior or contemporaneous oral agreements "is inadmissible to contradict, vary, or alter a written contract where the written instrument is valid, complete, and unambiguous, absent fraud or mistake or any claim or allegation thereof." *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 259 (Tenn. Ct. App. 1990) (citations omitted). Our courts have held, however, that parol evidence of an independent collateral agreement is admissible so long as the collateral agreement does not vary or contradict the writing. *Id.* The application of the parol evidence rule and its exceptions depends on the particular facts of each case. *Early v. Street*, 192 Tenn. 463, 472, 241 S.W.2d 531, 535 (1951).

In the instant case, the Agreement provides that Defendant would transfer a 3% interest in the Roberta Sanitary Landfill venture in exchange for "services rendered by [King and Plaintiff] for and on behalf of [Defendant] in association with" the landfill project. The Agreement does not expound upon "services rendered." Plaintiff argues that the language "services rendered" means services rendered by him *in the past*. In other words, he contends that his performance under the Agreement occurred *prior to* the execution of that document. Thus, he argues, it was improper to permit Defendant to testify regarding required performance on the part of Plaintiff that was to occur *subsequent to* the execution of the Agreement. As we understand his position, he received his 3% interest in exchange for consideration provided by him *before* the Agreement was executed. From

this, he argues that testimony regarding a commitment on his part to secure a $3 million investor is an attempt to impose a post-execution-of-agreement obligation on him and that this varies the terms of the Agreement and constitutes a violation of the parol evidence rule.

Plaintiff recognizes that his argument tends to prove too much, in that it raises the specter of the principal of law that, generally speaking, past consideration cannot support a current promise. *S. M. Williamson & Co. v. Ragsdale*, 170 Tenn. 439, 95 S.W. 2d 922, 924 (1936); *Gilman v. Kibler*, 24 Tenn. (5 Hum.) 19 (1844). He attempts to get around this principle by arguing that Defendant's promise to give him a 3% interest in the venture is, in fact, a gift to him. He relies upon the case of *Estate of Bowlin v. Ables*, 766 S.W. 2d 193 (Tenn. Ct. App. 1988), and contends that all of the elements of a gift are shown by the evidence.

We disagree with Plaintiff on both points. The evidence preponderates that Defendant's obligation in the Agreement was supported by Plaintiff's promise to perform certain obligations post-agreement. While there may be some ambiguity in the words "services rendered" as to whether this pertains to *past* activity of Plaintiff as opposed to *future* activity, we believe this ambiguity was cleared up by the testimony of Defendant as to what led up to the execution of the contract and the parties' dealings after the Agreement was signed. The challenged testimony merely addresses that which is not specifically stated in the Agreement; it simply fleshes out the words "services rendered."

The dealings of parties to a contract can, under certain circumstances, be evidence of what the parties contemplated by their contract. *Frierson v. Int'l Agric. Corp.*, 24 Tenn. App. 616, 148 S.W. 2d 27, 37 (1940). In this regard, it is interesting to note that Plaintiff attempted to secure investors *after* the Agreement was signed. In any event, the subject testimony does not run afoul of the parol evidence rule. That testimony merely tends to explain an ambiguous general concept – "services rendered." *See Airline Constr., Inc. v. Barr*, 807 S.W. 2d at 259.

There is no way that Defendant's promise to give Plaintiff 3% of the venture can be construed as a gift. The Agreement clearly reflects a business transaction whereby one party agrees to do something in exchange for performance on the part of the other party. The Agreement and the legal concept of a gift are totally incompatible. Thus, even if the Agreement were to be found to be supported wholly by past consideration – a position we reject – nevertheless Plaintiff is not entitled to the recovery he seeks because Defendant's promise of a 3% interest was not intended as a gift.

Even if the trial court erred in receiving this testimony into evidence, the error was harmless. *See* Tenn. R. App. P. 36(b). This testimony dealt with the Agreement; the trial court held – and the evidence does not preponderate against its holding – that the transactions out of which Plaintiff claims his 3% interest were not covered by the Agreement.

The trial court did not abuse its discretion when it received the subject testimony into evidence.

C.

Finally, Plaintiff argues that the trial court's failure to award him damages in excess of $4,500 is against the preponderance of the evidence.[2] We disagree.

The trial court arrived at the sum of $4,500 by reimbursing Plaintiff for the $2,000 he paid to attorney Doug Overbey in 1991 and by awarding Plaintiff $2,500, which represented his 3% interest in the Roberta Sanitary Landfill project. The trial court awarded the $2,500 based upon Defendant's purchase of King's 12% interest in the project for $10,000. A payment of $10,000 for a 12% interest extrapolates to a payment of $2,500 for a 3% interest. Plaintiff claims that he is entitled to almost $180,000, which represents 3% of the $6 million Defendant received for the sale of Scott Solid Waste to Liberty.

It is clear that the parties had an agreement, under which Plaintiff was obligated, *inter alia*, to assist Defendant in obtaining financing for the project. In exchange for Plaintiff's work, Defendant agreed to give Plaintiff a 3% interest in the business known as the *Roberta Sanitary Landfill.* There is no question that the parties operated under the Agreement up until sometime in 1993. In 1993, there is a clear line of demarcation. Plaintiff ceased doing any work for Defendant or his business enterprise. Defendant had no further contact with Plaintiff. In 1995, Defendant started an entirely new business enterprise known as Scott Solid Waste. Plaintiff did not participate, post-1993, in any of the activities that ultimately led to the formation of Scott Solid Waste, that company's subsequent business dealings, and the ultimate sale of that business to Liberty. Our review of the record convinces us that the Agreement contemplated *only* the business venture known as Roberta Sanitary Landfill, and not the formation of Scott Solid Waste. As such, we find that the evidence does not preponderate against the trial court's determination that Plaintiff was not entitled to 3% of the $6 million Defendant received in the sale of Scott Solid Waste to Liberty. The evidence does not preponderate against the trial court's determination that Plaintiff was not entitled to any damages over and above the $4,500 awarded to him.

IV.

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, R. Scott Martin.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[2]In his brief, Defendant states that Plaintiff was not entitled to any damages, but he expressly states that he is not making an issue on this appeal with respect to the trial court's award of $4,500.