IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 21, 2012 Session

## THE UNIVERSITY CORPORATION, A California Nonprofit Corporation v. BRUCE WRING

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-02-1414-1      Walter L. Evans, Chancellor**

---

**No. W2011-01126-COA-R3-CV - Filed September 18, 2012**

---

This case involves an agreement between the Appellee, a nonprofit corporation, and the Appellant, a real estate agent, whereby the Appellant would acquire foreclosed properties, oversee all necessary repairs and renovations of the properties, and ultimately sell them for the benefit of the Appellee. The Appellee's executive director was given the authority to act on its behalf in all dealings with the Appellant. As compensation, the Appellant received commissions on the purchase and sale of each property, and a percentage of the repair costs for his oversight of the repairs and renovations of each property. After operating pursuant to the oral agreement for over a year, the parties executed a written agreement for the same purpose. Throughout their relationship, the Appellant acquired approximately eighty-four (84) properties for the Appellee. Subsequently, after discovering that their records did not contain documentation of actual repair costs which the Appellant was required to submit under the written agreement, the Appellee filed a complaint for an accounting. The trial court appointed a Special Master to conduct an accounting. Following an evidentiary hearing, the Special Master filed a report in which he ordered that the Appellant be disgorged of all funds received by virtue of the agreements with the Appellee based on his failure to provide documentation of actual repair costs, and further suggested an award of attorney's fees and costs in favor of the Appellee. Thereafter, the trial court entered a final order adopting and confirming the Special Master's findings, and denied the Appellant's objections to the Special Master's report. After thoroughly reviewing the record, we conclude that the Appellant was not required to submit documentation of actual repair costs on the properties acquired pursuant to the oral agreement. We further conclude that the course of conduct between the Appellant and the Appellee's executive director modified the written agreement, such that the Appellant was not required to submit documentation of actual repair costs. As a result, we reverse the judgment of the trial court and remand for further proceedings.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J, W.S., and J. STEVEN STAFFORD, J., joined.

Elizabeth E. Chance, Memphis, Tennessee, for the appellant, Michael P. Coury, Chapter 11 Trustee for the Estate of Bruce Wring.

James R. Newsom, III, Memphis, Tennessee, for the appellee, The University Corporation.

**OPINION**

**I. Background and Procedural History**

The University Corporation ("TUC"), a California a nonprofit corporation, is an investment arm of The University of California, Northridge. TUC manages various investments through a Board of Directors and an Executive Director, who functions as TUC's Chief Executive Officer. Donald Queen ("Queen") served as TUC's Executive Director from approximately 1990 until his retirement in July 1998. Following his retirement, Queen remained at TUC as a consultant for a brief period of time.

In the fall of 1994, Bruce Wring ("Wring"), an associate realtor in Memphis, Tennessee, introduced Queen to investment opportunities in Memphis offered through the United States Department of Housing and Urban Development ("HUD"). The HUD investment program allowed nonprofit organizations to purchase repossessed HUD properties in "revitalization zones" at a thirty percent (30%) discount, so long as the nonprofit organization made a minimum amount of repairs to the properties and offered them for sale to qualifying low-income buyers. In addition to this program, in November 1995, Wring also introduced TUC to a second program which involved purchasing repossessed HUD properties outside of the designated "revitalization zones" at a twenty percent (20%) discount and offering them on a rent-to-own basis. The benefit of the rent-to-own program was that the tenant was responsible for all home repairs once the property was initially repaired for occupancy, removing the nonprofit organization's responsibility to pay for ongoing repairs.

As part of these investment programs, a HUD-approved inspector would inspect the properties and provide a detailed list of repairs needed to pass a HUD inspection. The HUD-approved inspector determined the costs of repairs by referencing a manual provided by HUD that listed estimated repair costs based on the region of the country where the property was located. All estimated repair costs, plus any applicable loan contingencies, were held in escrow until the necessary repairs were completed. After the repairs were made, a HUD-approved inspector would reinspect the property to confirm that the repairs had been satisfactorily completed. Once the inspector approved the repairs, the funds for the repairs

would be released from escrow.

In February 1995, based upon Queen's recommendation, TUC's Board of Directors approved a plan to participate in the HUD investment program. TUC's Board of Directors was not involved in any of the details of the HUD investment program, and relied entirely on Queen to oversee the transactions on behalf of TUC. To effectuate the plan, Queen entered into an oral agreement with Wring, whereby Wring would purchase and oversee repairs and renovations of the HUD properties. Under the oral agreement, Wring was to receive a six percent (6%) commission on the purchase and sale of the property, and twenty percent (20%) of the repair costs for overseeing the repairs made to the property, plus any applicable contingencies. During the time that TUC and Wring operated under the oral agreement, the costs of the repair work were based upon the HUD-approved inspector's estimates. Because Queen's primary focus was getting the repairs done for the estimated costs, he did not require Wring to get bids for repairs or send invoices or proposals for repair work. Wring, however, did send copies of settlement documents to Queen, which included the estimated repair costs, purchase price, and final mortgage terms of each property. Pursuant to the oral agreement, from February 1995 until June 1996, Wring purchased and renovated thirty-one (31) properties for TUC.

On June 30, 1996, TUC and Wring entered into a written agreement.[1] The written agreement provided that Wring was to act as TUC's agent in the acquisition and oversight of the maintenance, repair, and renovation of HUD properties in Memphis. Also, Wring was to provide TUC with "original documentation of all paperwork involved in each transaction, including but not limited to, all purchase and sell agreements, settlement agreements, mortgage/lender documentation, insurance notices, internal accounting records, invoices for work completed, utility bills, etc." Regarding compensation, Wring was to receive a six percent (6%) commission on the purchase and sale of the property, similar to his commissions under the oral agreement. The written agreement further provided for Wring's compensation as follows:

> **ADDITIONAL COMPENSATION.** In addition to the commissions as described in sections 4 and 5 above, [Wring] will receive twenty percent (20%) of the actual maintenance, repair, renovation costs incurred under paragraph 8 hereof not to exceed the repair and/or renovation costs as estimated by the mortgage company through their independent analysis of the fix up costs of each

---

[1]On that same day, TUC entered into a written agreement with Davis Home Improvement ("DHI"), a Tennessee corporation owned and operated by Wring and his family. The written agreement provided that DHI would serve as the contractor for TUC in the repair, renovation, and maintenance of the HUD properties acquired by Wring.

property that is a part of the loan origination package. In the event that the actual repair, renovation costs are less than those costs estimated by HUD, [Wring] will receive Twenty Five percent (25%) of the difference between the estimated cost and the actual costs.

Queen executed the written agreement with Wring on behalf of TUC.

Throughout their relationship, Wring secured a total of eighty-four (84) properties for TUC, acquiring the last property on October, 8, 1998. In December 1998, after discovering that it owned more HUD properties in Memphis than it had originally approved Queen to acquire, TUC's Board of Director's began evaluating its records regarding the HUD investment properties. Shortly thereafter, Queen retired from TUC as Executive Director. As a result, in February 1999, TUC hired a new Executive Director, Thomas McCarron ("McCarron"), who was given the authority to oversee the HUD investment programs. After reviewing TUC's files on the HUD properties in Memphis, McCarron discovered that there was very little documentation regarding the HUD investment properties in Memphis. Specifically, there were no records concerning the actual repair costs of the HUD properties as required by the written agreement between TUC and Wring. In November 2000, TUC hired a Director of Real Estate and Contracts who also began evaluating the HUD investment properties in Memphis and discovered the lack of documentation and records that were required to be submitted by Wring under the written agreement. Thereafter, TUC requested numerous times that Wring provide them with all documentation on each property acquired during their relationship and increased the restrictions on his authority as manager of the rental properties. On December 19, 2000, Wring responded to TUC by letter in which he stated that he wished to resign as TUC's agent, to be effective January 1, 2001. Litigation followed.

On July 24, 2002, TUC filed a Complaint for Accounting and Other Relief against Wring in the Chancery Court of Shelby County. Thereafter, on September 25, 2003, the trial court granted TUC's Motion to Require an Accounting, and appointed a Special Master to conduct an accounting. On September 28, 2006, the trial court denied Wring's Motion for Summary Judgment in which he argued that the statute of limitations barred TUC's claims for any transactions that occurred before July 24, 1996. On April 26 and 27, 2007, the Special Master conducted an evidentiary hearing. At the hearing, the evidence presented to the Special Master included, *inter alia,* multiple exhibits, the deposition of Queen, and the live testimony of Wring, TUC's Director of Real Estate and Contracts, and a member of TUC's Board of Directors. Subsequently, on June 15, 2010, the Special Master filed his report, in which he determined that:

Since there was a lack of records produced by [Wring] and since [Wring] used

-4-

'estimated' rather than actual costs, the Special Master finds a) that [Wring] should disgorge all funds received by virtue of the subject agreements including his 6% commissions on the purchase **and** sales of the properties, b) the 20% fee for oversight of the repairs, c) the 15% contingency, and d) the 10% contingency.

Further, the Special Master determined that the total damages were $816,581.00, and suggested that TUC also receive an award of attorney's fees and expenses. On March 31, 2011, the trial court entered its Final Judgment Adopting and Confirming Report of the Special Master and Awarding Attorney's Fees. In addition to adopting and confirming all of the Special Master's findings, the trial court denied Wring's objections to the Special Master's report, including Wring's objection that the Special Master erred by failing to find that an oral agreement existed and governed any transactions that occurred before the written agreement was executed. The trial court concluded that "even if there was a prior oral agreement, the later written [a]greement superseded any prior oral agreement."[2] Wring timely filed a notice of appeal to this Court.[3]

## II. Issues Presented

The following issues, as restated, are presented for our review:

(1)    Whether the written agreement between the TUC and Wring governed

---

[2]The trial court relied on the following provision from the written agreement as the basis of its conclusion:

> ENTIRE AGREEMENT; MODIFICATION; WAIVER. The parties hereby agree that no representations, promises, or inducements of any kind have been made by any party, employee, agent or attorney of any party, other than appear in writing in this document, and this document (as signed this date) constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification or amendment of this agreement shall be binding unless executed in writing by all the parties. No waiver of any of the provisions of this agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed by the party making the waiver. Waiver of any breach of this agreement shall not be deemed to constitute waiver of any other future breach.

[3]On July 20, 2011, this Court entered an order allowing Michael P. Coury, the Chapter 11 Trustee for the Estate of Bruce Wring, to substitute as a party/appellant in this cause.

transactions that occurred before its execution,

(2) Whether any claims concerning transactions that occurred before July 24, 1996 are barred by the statute of limitations,

(3) Whether the course of conduct between Queen and Wring modified the written agreement,

(4) Whether the Special Master erred in calculating the amount of damages awarded,

(5) Whether material evidence supports the concurrent findings of the Special Master and the trial court,

(6) Whether the trial court erred in awarding attorney's fees and costs to TUC, and

(7) Whether either party is entitled to an award of attorney's fees and costs incurred on appeal.

### III. Standard of Review

Pursuant to Tennessee Code Annotated section 27-1-113, "[w]here there has been a concurrent finding of the master and chancellor, which under the principles now obtaining is binding on the appellate courts, the court of appeals shall not have the right to disturb such finding." Tenn. Code Ann. § 27-1-113 (2000). As further explained by this Court in *Blankenship v. Blankenship*, 59 S.W.3d 115 (Tenn. Ct. App. 2001):

> The concurrent finding of a master and a chancellor has the same force and effect as a jury verdict approved by the trial judge. Such a concurrence is conclusive on appeal unless (1) the issue is one not proper for reference to a master, (2) the concurrence is based on an error of law or a mixed question of law and fact, or (3) the concurrence is not supported by any material evidence.

*Id.* at 117, (citations omitted). When the findings below are not concurrent, however, we review the trial court's findings of fact *de novo* upon the record with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). If the trial court fails to make a specific finding of fact on a particular matter, we review the facts in the record under a purely *de novo* standard. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn. 2001)). We review all

issues of law *de novo* with no presumption of correctness. *Id.* (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn.1993)).

## IV. Analysis

### A.

We begin by addressing the issue of whether the written agreement between TUC and Wring governed transactions that occurred before the execution of the written agreement. Because this issue involves the interpretation of a contract, the findings below do not have conclusive effect on this Court. *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 533 (Tenn. 2004); *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (holding that "[t]he interpretation of a contract is a matter of law that requires a *de novo* review on appeal.").

It is undisputed that the parties executed the written agreement on June 30, 1996. It is also undisputed that Wring, as TUC's agent, acquired and renovated approximately thirty-one (31) HUD properties before the parties executed the written agreement. In the time preceding the written agreement, it is undisputed that Wring and Queen instead operated pursuant to an oral agreement. Notwithstanding these undisputed facts, the Special Master failed to address the oral agreement, and the trial court merely concluded that, "even if there was a prior oral agreement, the later written [a]greement superseded any prior oral agreement."

While we agree with the trial court that the merger clause contained in the written agreement would supersede any prior or contemporaneous agreements between the parties, we respectfully disagree with the trial court's conclusion as to the legal effect of that merger clause. There is simply no factual or legal basis to conclude that the thirty-one (31) HUD properties, acquired and renovated before the written agreement was executed, were retroactively governed by the written agreement. Simply put, a merger clause contained in a written agreement does not affect prior oral agreements until the written agreement is executed and in effect. *See Fabrication Sales Co. of Tennessee v. Pacific Press and Shear, Inc.*, No. 01-A-019110CH00363, 1992 WL 85808, at *4 (Tenn. Ct. App. April 29, 1992). As noted above, the Special Master ordered disgorgement based on Wring's failure to provide documentation of actual repair costs to TUC. However, this requirement under the written agreement was not applicable to the HUD properties acquired pursuant to the oral agreement. Thus, the Special Master erred in including the HUD properties acquired before the execution of the written agreement within his determination of liability and damages. Therefore, we reverse the judgment of the trial court to the extent that it adopts and confirms

this portion of the Special Master's report.[4]

**B.**

Next, we address Wring's argument that the course of conduct between himself and Queen modified the requirement in the written agreement that he provide documentation of actual repair costs on each property. In response, TUC argues that the merger clause in the written agreement, and the parol evidence rule, prevent any modification of the written agreement. Although Wring raised the issue in the proceedings below, both the Special Master and the trial court failed to make any findings as to whether the course of conduct between the parties resulted in a modification of the written agreement. As a result, we shall review the record and make those specific findings of fact based on a purely *de novo* standard. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Fields v. State*, 40 S.W.3d 450, 457 n. 5 (Tenn. 2001)).

Under Tennessee law, "parol evidence is inadmissible to contradict or vary the terms of a written agreement." *In re Estate of Hawkins*, W2003-02279-COA-R3CV, 2004 WL 2951993, at *4 (Tenn. Ct. App. Dec. 16, 2004) (citing *Starnes v. First Am. Nat'l Bank of Jackson*, 723 S.W.2d 113, 117 (Tenn. Ct. App. 1986) (citing *Maddox v. Webb Constr. Co.*, 562 S.W.2d 198 (Tenn. 1978); *Santa Barbara Capital Corp. v. World Christian Radio Found., Inc.*, 491 S.W.2d 852 (Tenn. Ct. App. 1972))).

> But it is well settled that this rule does not prohibit the establishment by parol evidence of an agreement made subsequent to the execution of the writing, although such subsequent agreement may have the effect of adding to, changing, modifying or even altogether abrogating the contract of the parties as evidenced by the writing; for the parol evidence does not in any way deny that the original agreement of the parties was that which the writing purports to express, but merely goes to show that the parties have exercised their right to change or abrogate the same, or to make a new and independent contract.

*Brunson v. Gladish*, 125 S.W.2d 144, 147 (Tenn. 1939) (citations omitted). Thus, any evidence of the subsequent modification of the written agreement between TUC and Wring is not barred by the parol evidence rule.

Additionally, "the course of conduct between parties is the strongest evidence of their

---

[4]Because we hold that the HUD properties acquired pursuant to the oral agreement were erroneously included in the determination of liability and damages, we need not address Wring's claims concerning whether they were barred by the statute of limitations.

original intent." *Long v. Langley*, W2001-01490-COA-R3-CV, 2002 WL 818224, at *5 (Tenn. Ct. App. Apr. 23, 2002) (citing *Frierson v. Int'l Agric. Corp.*, 148 S.W.2d 27, 37 (Tenn. Ct. App. 1940); *Pinson & Assoc. v. Kreal*, 800 S.W.2d 486, 487 (Tenn. Ct. App.1990)). "A party's agreement to a modification need not be express, but may be implied from a course of conduct; this is true even where the agreement expressly specifies, as in this case, that the parties may only modify the agreement in writing." *Constr. Crane & Tractor, Inc. v. Wirtgen Am., Inc.*, M200901131COAR3CV, 2010 WL 1172224, at *10 (Tenn. Ct. App. Mar. 24, 2010) (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1991); *Cooperative Stores Co. v. United States Fid. & Guar. Co.*, 137 Tenn. 609, 195 S.W. 177, 180 (1917)). Therefore, the presence of the merger clause in the written agreement is not dispositive in this matter.

After thoroughly reviewing the record, we conclude that the course of conduct between Wring and Queen modified the written agreement. Throughout the transcript of Queen's deposition, he testified as follows:

Q. Now did you ever see any of those proposals that [DHI] submitted?

A. I didn't see any proposals. I know that the work had to be approved by the HUD inspector before the bank would put out the money for the repair.

Q. Well that had to do with the cost of it to get it improved?

A. No, HUD had to approve the work.

Q. I understand that, Mr. Queen, but if the cost of the, it's the cost of the repairs that I am interested in. Did you ever see any proposals by [DHI] about what those repairs were going to cost?

A. Ahead of time?

Q. Yeah.

A. I don't think so.

Q. All right. So he submitted to Wring, didn't he, [DHI] submitted?

A. Well [DHI], I don't know if they even submitted any, to be honest with you.

Q.      In other words, you don't have any idea whether the costs of these repairs had anything to do with whether that was necessary to obtain approval, do you?

A.      My knowledge is that the work was done to the satisfaction of the HUD inspector, and I know that it was done within the cost estimate. That's what, that's all I was interested in knowing.

Q.      All you were interested in was if a door hinge had to be repaired and [DHI] charged $500 for it, it didn't make any difference to you as long as it was in the proposal and as long as it was within the estimate and as long as they approved it?

A.      Right.

Q.      Didn't bother you whether you might be paying to much for those repairs, did it?

A.      No, it didn't. As long as the total cost came within what HUD had estimated.

. . . .

Q.      All right, let me see if I understand this now. [DHI], under their either oral agreement or written agreement, is supposed to submit proposals to repair whatever HUD or the mortgage company thought was necessary. And as long as that proposal, which you never saw, was less than that estimate, that's all you cared about?

A.      Yes.

Q.      It doesn't matter to you if you were being overcharged for those, did it?

A.      That's right.

Q.      You didn't care if either [sic].

A.      I don't think I didn't care. It's a matter of you had to, if you can't be there, you have to take alternative methods to get something done. And since I couldn't be there, then I had to rely on [Wring] for that. And the

-10-

fact that the costs never exceeded that, I think that was a rational move.

. . . .

Q.    And you never required [Wring] to get bids, you just took?

A.    Right.

Q.    His company's figure?

A.    Right.

Q.    And if it was one cent under the estimate, that's okay with you?

A.    Right.

. . . .

Q.    You didn't see any of the proposals for repairs?

A.    Right.

Q.    We know there were no bids for the repairs because you let [DHI] do it as long as they were underneath the estimate?

A.    Right.

Q.    Regardless of what the repairs cost?

A.    Mm-mm.

Q.    And [Wring] got a minimum of 20 percent to oversee his own company's repairs?

A.    For the twenty-fifth time, yes.

. . . .

Q.    You were in charge though, right?

A.    Right.

Q.    No question about that?

A.    Yes.

Q.    Isn't this your responsibility, these houses?

A.    Right.

Q.    So you didn't look at them, and if there was a check made to Joe Blow for repairs, you had no idea whether those repairs were done or what you got for your money?

A.    That's right.

Q.    If you had looked at it.

A.    If I had looked at it, I wouldn't have known.

Q.    You wouldn't know.  Did you have any back up?

A.    No.

Q.    Wring ever send you any back up receipts on all these jobs?

A.    I don't think so.

Q.    All right.  You never saw the proposals, you have already testified to that, that [DHI] made?

A.    Right.

Q.    You never saw it?

A.    Correct.

Moreover, during the evidentiary hearing before the Special Master, Wring testified as follows:

Q. [A]t the inception of your arrangement with [TUC], you made those arrangements with [Queen]; is that correct?

A. That's correct.

Q. And you operated under an oral understanding with [Queen] from '94 through '96?

A. That's correct.

Q. And during that period of time, there was no written agreement at all, in terms of the rehab work to be done by DHI or your agency relationship with [TUC]; is that correct?

A. That's correct.

Q. In fact, it was done more or less on a handshake?

A. That's correct.

. . . .

Q. [W]as there any time any disagreement or discontentment or criticisms voiced by [Queen] regarding those repair estimates?

A. Every conversation I ever had with [Queen] is he was very pleased with the program and how it was going and was very happy with the work and the work quality. . . .

. . . . That's all he was ever asking was the work be done according to quality that they required.

Q. And is it your testimony that the disbursing agency, that is, to wit, the bank wouldn't have released a dollar until the repair work had been verified?

A. That's the only way it could be done. That was the rules. The lender couldn't loan them and couldn't give you the money unless they had a sheet showing it had been done.

Q. And the bank would review those?

A. Yes.

Q. And then make disbursements?

A. Uh-huh (affirmative).

Q. When they were satisfied that the work had been done based on the estimate?

A. That's correct.

. . . .

Q. What was your understanding with [Queen] under the oral agreements you had with him regarding the method of charging and the method of disbursing for repair work?

A. It was also agreed between he and I that whatever HUD inspector wrote out would be the contract price to do the work. And as long as I did not exceed that he was happy.

Q. That was your agreement?

A. That was our agreement.

. . . .

Q. And did you ever hear from [TUC] regarding the oral understanding you had with [Queen]?

A. I never heard from anybody at [TUC] except [Queen], and he was always happy with the program.

Q. Did you ever get any correspondence of any sort from anybody from [TUC] who expressed any disagreement with the arrangement you had with [Queen]?

A. None.

Q.   Now I take it that – did [Queen] get all of the closing statements?

A.   He got every closing statement, every contract we purchased. He got all the copies of the repairs. All that stuff.

And I know after we sent some big packets out there he reduced down at one time, and said, hey, I only want this paper, this paper, and this paper. That's all I need. I don't need my – I guess, my filing cabinets full of this stuff here that don't mean anything.

Q.   Did [Queen] ever ask you to give any detail or breakdown outside of the written estimate of [the HUD inspector]?

A.   No. He wasn't concerned about how many nails you used, how many screws you used. I think he was interested in, did you get the thing done for what the estimate was? If I did, he was happy.

. . . .

Q.   Now, on the – under the written agreement, did you sign certain contracts. You signed one and [DHI] signed one. Is that a fair statement?

A.   Yes.

Q.   And in terms of the method of charging for the repair work, did anything change?

A.   No.

Q.   Was it your understanding with [Queen] that nothing was to change?

A.   Yes.

. . . .

Q.   You had the oral agreement. And you had the written agreement.

A.   Yes.

Q.   All right.  So what change did you make in your procedure to accommodate the written agreement?

A.   As far as I can recall that we were operating the same way before the written agreement that we did after the written agreement.

I don't know of any changes that were made, because [Queen] already understood what we were doing and so on down the line.

Q.   Was [Queen] fully knowledgeable about your method of charging?

A.   Yes, he was.

Q.   And did he ever complain or tell you or say to you in any sort of way that he didn't want you – he wanted you to change your method of charging for the repair work done by [DHI]?

. . . .

A.   Every indication I read from [Queen] was that he was very happy with all the repairs, and the way things was going.  He thought the program was great, and he said he only wished we could get more.

. . . .

Q.   Was it ever expressed to you in any kind of way that you couldn't charge the estimated – I mean that [DHI] couldn't charge the estimated repair costs?

A.   No.  I think it was expected.  That was what was expected of it to be done.

In some cases where we were able to do it less, and there were a few, [Queen] put it there so if there was some way we could, that we would get a bonus for doing it.  But he didn't expect it.

Clearly, both under the oral and written agreements, Wring and Queen operated based on the estimated repair costs provided by the HUD-approved inspector.  Although the written agreement required Wring to provide documentation of actual repair costs, the subsequent conduct between Queen and Wring impliedly modified such requirement.  Despite TUC's

argument that Queen was not authorized to modify the written agreement, it is clear from the record that TUC's Board of Directors expressly authorized Queen to act on its behalf in the pursuit of the HUD investment programs. Even if Queen lacked the express authority to modify the written agreement, apparent authority existed based on Queen's ongoing acceptance of estimated repair costs, TUC's failure to monitor or intervene, and Wring's good faith belief that such conduct was permissible.[5] Because Queen and Wring's course of conduct modified the written agreement, we conclude that Wring did not breach the written agreement by failing to provide documentation of actual repair costs. In light of the forgoing, we reverse the trial court's award of damages in favor of TUC. Further, as provided in the written agreement:

> **ATTORNEY'S FEES.** If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this agreement, the prevailing party shall be entitled to a reasonable attorney's fees, which may be set by the court in the same action or in a separate action brought for that purpose, in addition to any other relief to which the party may be entitled.

Because TUC is no longer the prevailing party, we reverse the trial court's award of attorney's fees and costs. As the new prevailing party, Wring is entitled under the written agreement to an award of attorney's fees and costs incurred in the proceedings below, which the trial court shall calculate on remand. We decline to award attorney's fees incurred on appeal. All other issues in this cause are pretermitted.

---

[5] As this Court explained in *Milliken Group, Inc. v. Hays Nissan, Inc.*, 86 S.W.3d 564 (Tenn. Ct. App. 2001):

> The liability of the principal for the acts and contracts of his agent is not limited to such acts and contracts of the agent as are expressly authorized, necessarily implied from express authority, or otherwise actually conferred by implication from the acts and conduct of the principal. So far as concerns a third person dealing with an agent, the agent's "scope of authority" includes not only the actual authorization conferred upon the agent by the principal, but also that which has apparently been delegated to him.... In effect, therefore, an agent's apparent authority is, as to third persons dealing in good faith with the subject of his agency and entitled to rely upon such appearance, his real authority, and it may apply to a single transaction, or to a series of transactions.

*Id.* at 570 (quoting 3 Am.Jur.2d Agency § 78 (1986)).

## Conclusion

For the forgoing reasons, we reverse the judgment of the trial court and remand for further proceedings consistent with this Opinion. Costs of this appeal are taxed to the Appellee, The University Corporation, for which execution may issue if necessary.

_____

DAVID R. FARMER, JUDGE